# SCHAD ET AL. *v.* BOROUGH OF MOUNT EPHRAIM

No. 79–1640.   Argued February 25, 1981—Decided June 1, 1981

WHITE, J., delivered the opinion of the Court, in which BRENNAN, STEWART, MARSHALL, BLACKMUN, and POWELL, JJ., joined. BLACKMUN, J., filed a concurring opinion, *post*, p. 77. POWELL, J., filed a concurring opinion, in which STEWART, J., joined, *post*, p. 79. STEVENS, J., filed an opinion concurring in the judgment, *post*, p. 79. BURGER, C. J., filed a dissenting opinion, in which REHNQUIST, J., joined, *post*, p. 85.

*Robert E. Levy* argued the cause for appellants. With him on the brief was *Lewis H. Robertson*.

*Arnold N. Fishman* argued the cause and filed a brief for appellee.\*

JUSTICE WHITE delivered the opinion of the Court.

In 1973, appellants began operating an adult bookstore in the commercial zone in the Borough of Mount Ephraim in Camden County, N. J. The store sold adult books, magazines, and films. Amusement licenses shortly issued permitting the store to install coin-operated devices by virtue of which a customer could sit in a booth, insert a coin, and watch an adult film. In 1976, the store introduced an additional coin-operated mechanism permitting the customer to watch a live dancer, usually nude, performing behind a glass panel.

---

*\*Bruce J. Ennis* filed a brief for the American Civil Liberties Union et al. as *amici curiae* urging reversal.

*Anthony H. Atlas* filed a brief for Morality in Media, Inc., as *amicus curiae* urging affirmance.

Complaints were soon filed against appellants charging that the bookstore's exhibition of live dancing violated § 99–15B of Mount Ephraim's zoning ordinance, which described the permitted uses in a commercial zone,[1] in which the store was located, as follows:

"B. Principal permitted uses on the land and in buildings.

"(1) Offices and banks; taverns; restaurants and luncheonettes for sit-down dinners only and with no drive-in facilities; automobile sales; retail stores, such as but not limited to food, wearing apparel, millinery, fabrics, hardware, lumber, jewelry, paint, wallpaper, appliances, flowers, gifts, books, stationery, pharmacy, liquors, cleaners, novelties, hobbies and toys; repair shops for shoes, jewels, clothes and appliances; barbershops and beauty salons; cleaners and laundries; pet stores; and nurseries. Offices may, in addition, be permitted to a group of four (4) stores or more without additional parking, provided the offices do not exceed the equivalent of twenty percent (20%) of the gross floor area of the stores.

"(2) Motels." Mount Ephraim Code § 99–15B (1), (2) (1979).[2]

---

[1] The zoning ordinance establishes three types of zones. The "R–1" residential district is zoned for single-family dwellings. The "R–2" residential district is zoned for single-family dwellings, townhouses, and garden apartments. The "C" district is zoned for commercial use, as specified in § 99–15 of the Mount Ephraim Code. See Mount Ephraim Code § 99–7 (1979).

[2] Section 99–15A states the purpose of the commercial zone:

"A. Purpose. The purpose of this district is to provide areas for local and regional commercial operations. The zone district pattern recognizes the strip commercial pattern which exists along Kings Highway and the Black Horse Pike. It is intended, however, to encourage such existing uses and any new uses or redevelopment to improve upon the zoning districts of greater depth by encouraging shopping-center-type development with buildings related to each other in design, landscaping and site planning and by requiring off-street parking, controlled ingress and egress,

Section 99–4 of the Borough's code provided that "[a]ll uses not expressly permitted in this chapter are prohibited."

Appellants were found guilty in the Municipal Court and fines were imposed. Appeal was taken to the Camden County Court, where a trial *de novo* was held on the record made in the Municipal Court and appellants were again found guilty. The County Court first rejected appellants' claim that the ordinance was being selectively and improperly enforced against them because other establishments offering live entertainment were permitted in the commercial zones.[3] Those establishments, the court held, were permitted, nonconforming uses that had existed prior to the passage of the ordinance. In response to appellants' defense based on the First and Fourteenth Amendments, the court recognized that "live nude dancing is protected by the First Amendment" but was of the view that "First Amendment guarantees are not involved" since the case "involves solely a zoning ordinance" under which "[l]ive entertainment is simply not a permitted use in any establishment" whether the entertainment is a nude dance or some other form of live presentation. App. to Juris. Statement 8a, 12a. Reliance was placed on the statement in *Young* v. *American Mini Theatres, Inc.*, 427 U. S. 50, 62 (1976), that "[t]he mere fact that the commercial exploitation of material protected by the First Amendment is

---

greater building setbacks, buffer areas along property lines adjacent to residential uses, and a concentration of commercial uses into fewer locations to eliminate the strip pattern."

[3] The building inspector, who is responsible for enforcing the zoning ordinance, testified that three establishments located in commercial zones of the Borough offered live music. However, he stated that they were permitted to do so only because this use of the premises preceded the enactment of the zoning ordinance and thus qualified as a "nonconforming" use under the ordinance. Munic. Ct. Tr. 21–25, 35–36, 55–59.

The Police Chief also testified. He stated that he knew of no live entertainment in the commercial zones other than that offered by appellants and by the three establishments mentioned by the building inspector. *Id.*, at 67.

subject to zoning and other licensing requirements is not a sufficient reason for invalidating these ordinances." The Appellate Division of the Superior Court of New Jersey affirmed appellants' convictions in a *per curiam* opinion "essentially for the reasons" given by the County Court. App. to Juris. Statement 14a. The Supreme Court of New Jersey denied further review. *Id.,* at 17a, 18a.

Appellants appealed to this Court. Their principal claim is that the imposition of criminal penalties under an ordinance prohibiting all live entertainment, including nonobscene, nude dancing, violated their rights of free expression guaranteed by the First and Fourteenth Amendments of the United States Constitution.[4] We noted probable jurisdiction, 449 U. S. 897 (1980), and now set aside appellants' convictions.

## I

As the Mount Ephraim Code has been construed by the New Jersey courts—a construction that is binding upon us— "live entertainment," including nude dancing, is "not a permitted use in any establishment" in the Borough of Mount Ephraim. App. to Juris. Statement 12a. By excluding live entertainment throughout the Borough, the Mount Ephraim ordinance prohibits a wide range of expression that has long been held to be within the protections of the First and Fourteenth Amendments. Entertainment, as well as political and ideological speech, is protected; motion pictures, programs broadcast by radio and television, and live entertainment, such as musical and dramatic works, fall within the First Amendment guarantee. *Joseph Burstyn, Inc.* v. *Wilson,* 343

---

[4] Appellants also contend that the zoning ordinance, as applied to them, violates due process and equal protection, since the Borough has acted arbitrarily and irrationally in prohibiting booths in which customers can view live nude dancing while permitting coin-operated movie booths. Since we sustain appellants' First Amendment challenge to the ordinance, we do not address these additional claims.

U. S. 495 (1952); *Schacht* v. *United States,* 398 U. S. 58 (1970); *Jenkins* v. *Georgia,* 418 U. S. 153 (1974); *Southeastern Promotions, Ltd.* v. *Conrad,* 420 U. S. 546 (1975); *Erznoznik* v. *City of Jacksonville,* 422 U. S. 205 (1975); *Doran* v. *Salem Inn, Inc.* 422 U. S. 922 (1975). See also *California* v. *LaRue,* 409 U. S. 109, 118 (1972); *Young* v. *American Mini Theatres, Inc., supra,* at 61, 62. Nor may an entertainment program be prohibited solely because it displays the nude human figure. "[N]udity alone" does not place otherwise protected material outside the mantle of the First Amendment. *Jenkins* v. *Georgia, supra,* at 161; *Southeastern Promotions, Ltd.* v. *Conrad, supra; Erznoznik* v. *City of Jacksonville, supra,* at 211–212, 213. Furthermore, as the state courts in this case recognized, nude dancing is not without its First Amendment protections from official regulation. *Doran* v. *Salem Inn, Inc., supra; Southeastern Promotions, Ltd.* v. *Conrad, supra; California* v. *LaRue, supra.*

Whatever First Amendment protection should be extended to nude dancing, live or on film, however, the Mount Ephraim ordinance prohibits all live entertainment in the Borough: no property in the Borough may be principally used for the commercial production of plays, concerts, musicals, dance, or any other form of live entertainment.[5] Because appellants' claims are rooted in the First Amendment, they are entitled to rely on the impact of the ordinance on the expressive activities of others as well as their own. "Because overbroad laws, like vague ones, deter privileged activit[ies], our cases firmly establish appellant's standing to raise an overbreadth challenge." *Grayned* v. *City of Rockford,* 408 U. S. 104, 114 (1972).

---

[5] The Borough's counsel asserted at oral argument that the ordinance would not prohibit noncommercial live entertainment, such as singing Christmas carols at an office party. Tr. of Oral Arg. 33. Apparently a high school could perform a play if it did not charge admission. However, the ordinance prohibits the production of plays in commercial theaters. *Id.,* at 34.

## II

The First Amendment requires that there be sufficient justification for the exclusion of a broad category of protected expression as one of the permitted commercial uses in the Borough. The justification does not appear on the face of the ordinance since the ordinance itself is ambiguous with respect to whether live entertainment is permitted: § 99–15B purports to specify only the "principal" permitted uses in commercial establishments, and its listing of permitted retail establishments is expressly nonexclusive; yet, § 99–4 declares that all uses not expressly permitted are forbidden.[6] The state courts at least partially resolved the ambiguity by declaring live entertainment to be an impermissible commercial use. In doing so, the County Court, whose opinion was adopted by the Appellate Division of the Superior Court, sought to avoid or

---

[6] Service stations are not listed as principal permitted uses in § 99–15B. However, both § 99–15E ("Area and yard requirements") and § 99–15F ("Minimum off-street parking") specifically refer to service stations, and § 99–15J limits the construction or expansion of service stations in a designated area of the commercial district. Service stations would thus appear to be permitted uses even though not expressly listed in § 99–15B.

Various official views have been expressed as to what extent entertainment is excluded from the commercial zone. At the initial evidentiary hearing, the prosecutor suggested that the ordinance only banned "*live* entertainment" in commercial establishments. Munic. Ct. Tr. 49 (emphasis added). By contrast, the building inspector for the Borough stated that there was no basis for distinguishing between live entertainment and other entertainment under the ordinance. *Id.*, at 20, 50. Before this Court, the Borough asserted in its brief that the ordinance "does not prohibit all entertainment, but only live entertainment," Brief for Appellee 21, yet counsel for the Borough stated during oral argument that the ordinance prohibits commercial establishments from offering any entertainment. Tr. of Oral Arg. 40. The County Court ruled that "live entertainment" is not a permitted use under § 99–15B, but it did not consider whether nonlive entertainment might be a permitted use. At oral argument, counsel for appellants referred to a movie theater in the Borough, Tr. of Oral Arg. 9, but counsel for the Borough explained that it is permitted only because it is a nonconforming use. *Id.*, at 28, 38–40.

to meet the First Amendment issue only by declaring that the restriction on the use of appellants' property was contained in a zoning ordinance that excluded all live entertainment from the Borough, including live nude dancing.

The power of local governments to zone and control land use is undoubtedly broad and its proper exercise is an essential aspect of achieving a satisfactory quality of life in both urban and rural communities. But the zoning power is not infinite and unchallengeable; it "must be exercised within constitutional limits." *Moore* v. *East Cleveland,* 431 U. S. 494, 514 (1977) (STEVENS, J., concurring in judgment). Accordingly, it is subject to judicial review; and as is most often the case, the standard of review is determined by the nature of the right assertedly threatened or violated rather than by the power being exercised or the specific limitation imposed. *Thomas* v. *Collins,* 323 U. S. 516, 529–530 (1945).

Where property interests are adversely affected by zoning, the courts generally have emphasized the breadth of municipal power to control land use and have sustained the regulation if it is rationally related to legitimate state concerns and does not deprive the owner of economically viable use of his property. *Agins* v. *City of Tiburon,* 447 U. S. 255, 260 (1980); *Village of Belle Terre* v. *Boraas,* 416 U. S. 1 (1974); *Euclid* v. *Ambler Realty Co.,* 272 U. S. 365, 395 (1926). But an ordinance may fail even under that limited standard of review. *Moore* v. *East Cleveland, supra,* at 520 (STEVENS, J., concurring in judgment); *Nectow* v. *Cambridge,* 277 U. S. 183 (1928).

Beyond that, as is true of other ordinances, when a zoning law infringes upon a protected liberty, it must be narrowly drawn and must further a sufficiently substantial government interest.[7] In *Schneider* v. *State,* 308 U. S. 147 (1939), for ex-

---

[7] In *Village of Belle Terre* v. *Boraas,* 416 U. S. 1 (1974), the Court upheld a zoning ordinance that restricted the use of land to "one-family" dwellings. The Court concluded that the municipality's definition of a

ample, the Court recognized its obligation to assess the substantiality of the justification offered for a regulation that significantly impinged on freedom of speech:

"Mere legislative preferences or beliefs respecting matters of public convenience may well support regulation directed at other personal activities, but be insufficient to justify such as diminishes the exercise of rights so vital to the maintenance of democratic institutions.

---

"family" (no more than two unrelated persons) did not burden any fundamental right guaranteed by the Constitution. *Id.*, at 7. Thus, it merely had to bear a rational relationship to a permissible state objective. *Id.*, at 8. JUSTICE MARSHALL dissented, asserting that the ordinance impinged on fundamental personal rights:

"[Thus,] it can withstand constitutional scrutiny only upon a clear showing that the burden imposed is necessary to protect a compelling and substantial governmental interest . . . . [T]he onus of demonstrating that no less intrusive means will adequately protect the compelling state interest and that the challenged statute is sufficiently narrowly drawn, is upon the party seeking to justify the burden." *Id.*, at 18 (citation omitted).

*Moore* v. *East Cleveland*, 431 U. S. 494 (1977), like *Belle Terre*, involved an ordinance that limited the occupancy of each dwelling to a single family. Unlike the ordinance challenged in *Belle Terre*, however, this ordinance defined "family" in a manner that prevented certain relatives from living together. JUSTICE POWELL, joined by three other Justices, concluded that the ordinance impermissibly impinged upon protected liberty interests. 431 U. S., at 499. JUSTICE STEVENS concluded that the ordinance did not even survive the *Euclid* test. 431 U. S., at 520–521. The dissenting opinions did not contend that zoning ordinances must always be deferentially reviewed. Rather, the dissenting Justices who addressed the issue rejected the view that the ordinance impinged upon interests that required heightened protection under the Due Process Clause. *Id.*, at 537 (STEWART, J., joined by REHNQUIST, J., dissenting), *id.*, at 549 (WHITE, J., dissenting).

Even where a challenged regulation restricts freedom of expression only incidentally or only in a small number of cases, we have scrutinized the governmental interest furthered by the regulation and have stated that the regulation must be narrowly drawn to avoid unnecessary intrusion on freedom of expression. See *United States* v. *O'Brien*, 391 U. S. 367, 376–377 (1968).

And so, as cases arise, the delicate and difficult task falls upon the courts to weigh the circumstances and to appraise the substantiality of the reasons advanced in support of the regulation of the free enjoyment of [First Amendment] rights." *Id.*, at 161.[8]

Similarly, in *Village of Schaumburg* v. *Citizens for a Better Environment*, 444 U. S. 620, 637 (1980),[9] it was emphasized that the Court must not only assess the substantiality of the governmental interests asserted but also determine whether those interests could be served by means that would be less intrusive on activity protected by the First Amendment:

"The Village may serve its legitimate interests, but it must do so by narrowly drawn regulations designed to serve those interests without unnecessarily interfering with First Amendment freedoms. *Hynes* v. *Mayor of Oradell*, 425 U. S., at 620; *First National Bank of Boston* v. *Bellotti*, 435 U. S. 765, 786 (1978). 'Broad prophylactic rules in the area of free expression are suspect. Precision of regulation must be the touchstone. . . .' *NAACP* v. *Button*, 371 U. S. 415, 438 (1963)."

---

[8] Several municipalities argued in *Schneider* that their antileafletting ordinances were designed to prevent littering of the streets. The Court did not deny that the ordinances would further that purpose, but it concluded that the cities' interest in preventing littering was not sufficiently strong to justify the limitation on First Amendment rights. The Court pointed out that the cities were free to pursue other methods of preventing littering, such as punishing those who actually threw papers on the streets. 308 U. S., at 162.

[9] *Village of Schaumburg* invalidated on First Amendment grounds a municipal ordinance prohibiting the solicitation of contributions by charitable organizations that did not use at least 75% of their receipts for "charitable purposes." Although recognizing that the Village had substantial interests " 'in protecting the public from fraud, crime, and undue annoyance,' " 444 U. S., at 636, we found these interests were "only peripherally promoted by the 75-percent requirement and could be sufficiently served by measures less destructive of First Amendment interests." *Ibid.*

JUSTICE POWELL said much the same thing in addressing the validity of a zoning ordinance in *Moore* v. *East Cleveland*, 431 U. S., at 499: when the government intrudes on one of the liberties protected by the Due Process Clause of the Fourteenth Amendment, "this Court must examine carefully the importance of the governmental interests advanced and the extent to which they are served by the challenged regulation." Because the ordinance challenged in this case significantly limits communicative activity within the Borough, we must scrutinize both the interests advanced by the Borough to justify this limitation on protected expression and the means chosen to further those interests.

As an initial matter, this case is not controlled by *Young* v. *American Mini Theatres, Inc.,* the decision relied upon by the Camden County Court. Although the Court there stated that a zoning ordinance is not invalid merely because it regulates activity protected under the First Amendment, it emphasized that the challenged restriction on the location of adult movie theaters imposed a minimal burden on protected speech. 427 U. S., at 62. The restriction did not affect the number of adult movie theaters that could operate in the city; it merely dispersed them. The Court did not imply that a municipality could ban all adult theaters—much less all live entertainment or all nude dancing—from its commercial districts citywide.[10] Moreover, it was emphasized in that

---

[10] JUSTICE STEVENS relied on the District Court's finding that compliance with the challenged ordinances would only impose a slight burden on First Amendment rights, since there were "myriad locations" within the city where new adult movie theaters could be located in compliance with the ordinances. 427 U. S., at 71, n. 35.

Similarly, JUSTICE POWELL's concurring opinion stressed that the effect of the challenged ordinance on First Amendment interests was "incidental and minimal." *Id.,* at 78. He did not suggest that a municipality could validly exclude theaters from its commercial zones if it had included other businesses presenting similar problems. Although he regarded the bur-

case that the evidence presented to the Detroit Common Council indicated that the concentration of adult movie theaters in limited areas led to deterioration of surrounding neighborhoods,[11] and it was concluded that the city had justified the incidental burden on First Amendment interests resulting from merely dispersing, but not excluding, adult theaters.

In this case, however, Mount Ephraim has not adequately justified its substantial restriction of protected activity.[12] None of the justifications asserted in this Court was articulated by the state courts and none of them withstands scrutiny. First, the Borough contends that permitting live entertainment would conflict with its plan to create a commercial area that caters only to the "immediate needs" of its residents and that would enable them to purchase at local stores the few items they occasionally forgot to buy outside the Borough.[13] No evidence was introduced below to support this assertion, and it is difficult to reconcile this characterization of the Borough's commercial zones with the provisions of the ordinance. Section 99–15A expressly states that the purpose of creating commercial zones was to provide areas for "local and *regional* commercial operations." (Emphasis added.) The

---

den imposed by the ordinance as minimal, JUSTICE POWELL examined the city's justification for the restriction before he concluded that the ordinance was valid. *Id.*, at 82, and n. 5. Emphasizing that the restriction was tailored to the particular problem identified by the city council, he acknowledged that "[t]he case would have present[ed] a different situation had Detroit brought within the ordinance types of theaters that had not been shown to contribute to the deterioration of surrounding areas." *Id.*, at 82.

[11] *Id.*, at 71, and n. 34 (opinion of STEVENS, J.); *id.*, at 82, n. 5 (POWELL, J., concurring).

[12] If the New Jersey courts had expressly interpreted this ordinance as banning all entertainment, we would reach the same result.

[13] Mount Ephraim's counsel stated in this Court that these stores were available "[i]f you come home at night and you forgot to buy your bread, your milk, your gift." Tr. of Oral Arg. 40.

range of permitted uses goes far beyond providing for the "immediate needs" of the residents. Motels, hardware stores, lumber stores, banks, offices, and car showrooms are permitted in commercial zones. The list of permitted "retail stores" is nonexclusive, and it includes such services as beauty salons, barbershops, cleaners, and restaurants. Virtually the only item or service that may not be sold in a commercial zone is entertainment, or at least live entertainment.[14] The Borough's first justification is patently insufficient.

Second, Mount Ephraim contends that it may selectively exclude commercial live entertainment from the broad range of commercial uses permitted in the Borough for reasons normally associated with zoning in commercial districts, that is, to avoid the problems that may be associated with live entertainment, such as parking, trash, police protection, and medical facilities. The Borough has presented no evidence, and it is not immediately apparent as a matter of experience, that live entertainment poses problems of this nature more significant than those associated with various permitted uses; nor does it appear that the Borough's zoning authority has arrived at a defensible conclusion that unusual problems are presented by live entertainment. Cf. *Young* v. *American Mini Theatres, Inc.*, 427 U. S., at 54–55, and n. 6.[15] We

---

[14] At present, this effect is somewhat lessened by the presence of at least three establishments that are permitted to offer live entertainment as a nonconforming use. See n. 3, *supra*. These uses apparently may continue indefinitely, since the Mount Ephraim Code does not require nonconforming uses to be terminated within a specified period of time. See Mount Ephraim Code § 99–24 (1979). The Borough's decision to permit live entertainment as a nonconforming use only undermines the Borough's contention that live entertainment poses inherent problems that justify its exclusion.

[15] The Borough also speculates that it may have concluded that live nude dancing is undesirable. Brief for Appellee 20. It is noted that in *California* v. *LaRue,* 409 U. S. 109 (1972), this Court identified a number of problems that California sought to eliminate by prohibiting certain

do not find it self-evident that a theater, for example, would create greater parking problems than would a restaurant.[16] Even less apparent is what unique problems would be posed by exhibiting live nude dancing in connection with the sale of adult books and films, particularly since the bookstore is licensed to exhibit nude dancing on films. It may be that some forms of live entertainment would create problems that are not associated with the commercial uses presently permitted in Mount Ephraim. Yet this ordinance is not narrowly drawn to respond to what might be the distinctive problems arising from certain types of live entertainment, and it is not clear that a more selective approach would fail to address those unique problems if any there are. The Borough has not established that its interests could not be met by restrictions that are less intrusive on protected forms of expression.

The Borough also suggests that § 99–15B is a reasonable "time, place, and manner" restriction; yet it does not identify the municipal interests making it reasonable to exclude all commercial live entertainment but to allow a variety of other

---

explicitly sexual entertainment in bars and in nightclubs licensed to serve liquor. This speculation lends no support to the challenged ordinance. First, § 99–15B excludes all live entertainment, not just live nude dancing. Even if Mount Ephraim might validly place restrictions on certain forms of live nude dancing under a narrowly drawn ordinance, this would not justify the exclusion of all live entertainment or, insofar as this record reveals, even the nude dancing involved in this case. Second, the regulation challenged in *California* v. *LaRue* was adopted only after the Department of Alcoholic Beverage Control had determined that significant problems were linked to the activity that was later regulated. Third, in *California* v. *LaRue* the Court relied heavily on the State's power under the Twenty-first Amendment. Cf. *Doran* v. *Salem Inn, Inc.*, 422 U. S. 922 (1975).

[16] Mount Ephraim has responded to the parking problems presented by the uses that are permitted in commercial zones by requiring that each type of commercial establishment provide a specified amount of parking. See Mount Ephraim Code §§ 99–15F (1979).

commercial uses in the Borough.[17] In *Grayned* v. *City of Rockford,* 408 U. S. 104 (1972), we stated:

> "The nature of a place, 'the pattern of its normal activities, dictate the kinds of regulations of time, place, and manner that are reasonable.' . . . The crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time. Our cases make clear that in assessing the reasonableness of a regulation, we must weigh heavily the fact that communication is involved; the regulation must be narrowly tailored to further the State's legitimate interest." *Id.,* at 116–117 (footnotes omitted).

Thus, the initial question in determining the validity of the exclusion as a time, place, and manner restriction is whether live entertainment is "basically incompatible with the normal activity [in the commercial zones]." As discussed above, no evidence has been presented to establish that live entertainment is incompatible with the uses presently permitted by the Borough. Mount Ephraim asserts that it could have chosen to eliminate all commercial uses within its boundaries. Yet we must assess the exclusion of live entertainment in light of the commercial uses Mount Ephraim allows, not in light of what the Borough might have done.[18]

To be reasonable, time, place, and manner restrictions not only must serve significant state interests but also must

---

[17] Mount Ephraim argued in its brief that nonlive entertainment is an adequate substitute for live entertainment. Brief for Appellee 20–21. This contention was apparently abandoned at oral argument, since the Borough's counsel stated that the ordinance bans all commercial entertainment. At any rate, the argument is an inadequate response to the fact that live entertainment, which the ordinance bans, is protected by the First Amendment.

[18] Thus, our decision today does not establish that every unit of local government entrusted with zoning responsibilities must provide a commercial zone in which live entertainment is permitted.

leave open adequate alternative channels of communication. *Grayned* v. *City of Rockford, supra,* at 116, 118; *Kovacs* v. *Cooper,* 336 U. S. 77, 85–87 (1949); see also *Consolidated Edison Co.* v. *Public Service Comm'n of New York,* 447 U. S. 530, 535 (1980); *Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council,* 425 U. S. 748, 771 (1976). Here, the Borough totally excludes all live entertainment, including non-obscene nude dancing that is otherwise protected by the First Amendment. As we have observed, *Young* v. *American Mini Theatres, Inc., supra,* did not purport to approve the total exclusion from the city of theaters showing adult, but not obscene, materials. It was carefully noted in that case that the number of regulated establishments was not limited and that "[t]he situation would be quite different if the ordinance had the effect of suppressing, or greatly restricting access to, lawful speech." 427 U. S., at 71, n. 35.

The Borough nevertheless contends that live entertainment in general and nude dancing in particular are amply available in close-by areas outside the limits of the Borough. Its position suggests the argument that if there were countywide zoning, it would be quite legal to allow live entertainment in only selected areas of the county and to exclude it from primarily residential communities, such as the Borough of Mount Ephraim. This may very well be true, but the Borough cannot avail itself of that argument in this case. There is no countywide zoning in Camden County, and Mount Ephraim is free under state law to impose its own zoning restrictions, within constitutional limits. Furthermore, there is no evidence in this record to support the proposition that the kind of entertainment appellants wish to provide is available in reasonably nearby areas. The courts below made no such findings; and at least in their absence, the ordinance excluding live entertainment from the commercial zone cannot constitutionally be applied to appellants so as to criminalize the activities for which they have been fined. "[O]ne is not to have the exercise of his liberty of expression in appropriate

places abridged on the plea that it may be exercised in some other place." *Schneider* v. *State,* 308 U. S., at 163.

Accordingly, the convictions of these appellants are infirm, and the judgment of the Appellate Division of the Superior Court of New Jersey is reversed and the case is remanded for further proceedings not inconsistent with this opinion.

*So ordered.*

JUSTICE BLACKMUN, concurring.

I join the Court's opinion, but write separately to address two points that I believe are sources of some ambiguity in this still emerging area of the law.

First, I would emphasize that the presumption of validity that traditionally attends a local government's exercise of its zoning powers carries little, if any, weight where the zoning regulation trenches on rights of expression protected under the First Amendment. In order for a reviewing court to determine whether a zoning restriction that impinges on free speech is "narrowly drawn [to] further a sufficiently substantial governmental interest," *ante,* at 68, the zoning authority must be prepared to articulate, and support, a reasoned and significant basis for its decision. This burden is by no means insurmountable, but neither should it be viewed as *de minimis.* In this case, Mount Ephraim evidently assumed that because the challenged ordinance was intended as a land-use regulation, it need survive only the minimal scrutiny of a rational relationship test, and that once rationality was established, appellants then carried the burden of proving the regulation invalid on First Amendment grounds. Brief for Appellee 11–12. After today's decision, it should be clear that where protected First Amendment interests are at stake, zoning regulations have no such "talismanic immunity from constitutional challenge." *Young* v. *American Mini Theatres, Inc.,* 427 U. S. 50, 75 (1976) (concurring opinion).

My other observation concerns the suggestion that a local

community should be free to eliminate a particular form of expression so long as that form is available in areas reasonably nearby. In *Mini Theatres* the Court dealt with locational restrictions imposed by a political subdivision, the city of Detroit, that preserved reasonable access to the regulated form of expression within the boundaries of that same subdivision. It would be a substantial step beyond *Mini Theatres* to conclude that a town or county may legislatively prevent its citizens from engaging in or having access to forms of protected expression that are incompatible with its majority's conception of the "decent life" solely because these activities are sufficiently available in other locales. I do not read the Court's opinion to reach, nor would I endorse, that conclusion.*

Were I a resident of Mount Ephraim, I would not expect my right to attend the theater or to purchase a novel to be contingent upon the availability of such opportunities in "nearby" Philadelphia, a community in whose decisions I would have no political voice. Cf. *Southeastern Promotions, Ltd.* v. *Conrad,* 420 U. S. 546, 556 (1975) (" '[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place,' " quoting *Schneider* v. *State,* 308 U. S. 147, 163 (1939)). Similarly, I would not expect the citizens of Philadelphia to be under any obligation to provide me with access to theaters and bookstores simply because Mount Ephraim previously had acted to ban these forms of "entertainment." This case does not require articulation of a rule for evaluating the meaning of "reasonable access" in different contexts. The scope of relevant zoning authority varies widely across our country, as do geographic configurations and types of commerce among neighboring communities, and this issue

---

*I need not address here the weight to be given other arguments invoked by local communities as a basis for restricting protected forms of expression.

will doubtless be resolved on a case-by-case basis. For now, it is sufficient to observe that in attempting to accommodate a locality's concern to protect the character of its community life, the Court must remain attentive to the guarantees of the First Amendment, and in particular to the protection they afford to minorities against the "standardization of ideas . . . by . . . dominant political or community groups." *Terminiello* v. *Chicago*, 337 U. S. 1, 4–5 (1949).

JUSTICE POWELL, with whom JUSTICE STEWART joins, concurring.

I join the Court's opinion as I agree that Mount Ephraim has failed altogether to justify its broad restriction of protected expression. This is not to say, however, that some communities are not free—by a more carefully drawn ordinance—to regulate or ban all commercial public entertainment. In my opinion, such an ordinance could be appropriate and valid in a residential community where all commercial activity is excluded. Similarly, a residential community should be able to limit commercial establishments to essential "neighborhood" services permitted in a narrowly zoned area.

But the Borough of Mount Ephraim failed to follow these paths. The ordinance before us was not carefully drawn and, as the Court points out, it is sufficiently overinclusive and underinclusive that any argument about the need to maintain the residential nature of this community fails as a justification.

JUSTICE STEVENS, concurring in the judgment.

The record in this case leaves so many relevant questions unanswered that the outcome, in my judgment, depends on the allocation of the burden of persuasion. If the case is viewed as a simple attempt by a small residential community to exclude the commercial exploitation of nude dancing from a "setting of tranquility," *post*, at 85 (BURGER, C. J., dissenting), it would seem reasonable to require appellants to over-

come the usual presumption that a municipality's zoning enactments are constitutionally valid. To prevail in this case, appellants at least would be required to show that the exclusion was applied selectively, or perhaps that comparable expressive activity is not "amply available in close-by areas outside the limits of the Borough." *Ante,* at 76 (opinion of the Court). On the other hand, if one starts, as the Court does, from the premise that "appellants' claims are rooted in the First Amendment," *ante,* at 66, it would seem reasonable to require the Borough to overcome a presumption of invalidity. The Borough could carry this burden by showing that its ordinances were narrowly drawn and furthered "a sufficiently substantial government interest." *Ante,* at 68 (opinion of the Court) (footnote omitted).

Neither of these characterizations provides me with a satisfactory approach to this case. For appellants' business is located in a commercial zone, and the character of that zone is not unequivocally identified either by the text of the Borough's zoning ordinance or by the evidence in the record. And even though the foliage of the First Amendment may cast protective shadows over some forms of nude dancing,[1] its roots were germinated by more serious concerns that are not necessarily implicated by a content-neutral zoning ordinance banning commercial exploitation of live entertainment. Cf. *Young* v. *American Mini Theatres, Inc.,* 427 U. S. 50, 60–61.

One of the puzzling features of this case is that the character of the prohibition the Borough seeks to enforce is so hard to ascertain. Because the written zoning ordinance purports to ban all commercial uses except those that are specifically listed—and because no form of entertainment is listed—literally it prohibits the commercial exploitation not only of live entertainment, but of motion pictures and inanimate forms

---

[1] See, *e. g., Doran* v. *Salem Inn, Inc.,* 422 U. S. 922, 932; *Southeastern Promotions, Ltd.* v. *Conrad,* 420 U. S. 546, 557–558; *California* v. *LaRue,* 409 U. S. 109, 118.

as well.[2] But the record indicates that what actually happens in this commercial zone may bear little resemblance to what is described in the text of the zoning ordinance.

The commercial zone in which appellants' adult bookstore is located is situated along the Black Horse Pike, a north-south artery on the eastern fringe of the Borough.[3] The parties seem to agree that this commercial zone is relatively small; presumably, therefore, it contains only a handful of commercial establishments. Among these establishments are Al-Jo's, also known as the Club Al-Jo, My Dad's, and Capriotti's, all of which offer live entertainment.[4] In addition,

---

[2] Section 99–15B of the Mount Ephraim Code, quoted *ante*, at 63 (opinion of the Court), lists the land uses permitted in the Borough's commercial zones. No form of entertainment is included in this list. Section 99–4 of the Code provides that "[a]ll uses not expressly permitted in this chapter are prohibited."

[3] At oral argument in this Court, counsel for the appellants asserted that the commercial zone extends for 250 feet on either side of the Black Horse Pike, and that the remainder of the Borough is zoned for residential use. See Tr. of Oral Arg. 5. THE CHIEF JUSTICE, in dissent, apparently relies upon counsel's description of Mount Ephraim's zoning pattern in support of his contention that Mount Ephraim is a quiet, " 'bedroom' community" into which appellants have thrust the disruptive influence of nude dancing. See *post*, at 85. However, counsel's assertion is unsupported by the record in this case, and indeed is inconsistent with the Borough's zoning ordinance. The Zoning Map of the Borough of Mount Ephraim indicates that, rather than containing a single commercial zone, Mount Ephraim in fact contains four commercial zones. Section 99–8 of the Mount Ephraim Code states that the boundaries of the zoning districts created by § 99–7 of the Code "are hereby established as shown on the map entitled 'Zoning Map of the Borough of Mount Ephraim' which accompanies and is hereby made a part of this chapter." The record does not reveal to what extent, if any, the three additional commercial zones have been commercially developed, but it is apparent from the Borough's Code that Mount Ephraim either has accepted or is prepared to accept a greater degree of commercial development than that presently found in the vicinity of appellants' bookstore.

[4] See Munic. Ct. Tr. 21–22, 35–37, 55, 58–59, 67. My Dad's, which is located directly across the street from appellants' bookstore, features a

the zone contains the Mount Ephraim Democratic Club, the Spread Eagle Inn, and Guiseppi's.[5] The record also contains isolated references to establishments known as the Villa Picasso and Millie's.[6] Although not mentioned in the record, Mount Ephraim apparently also supports a commercial motion picture theater.[7]

The record reveals very little about the character of most of these establishments, and it reveals nothing at all about the motion picture theater. The one fact that does appear with clarity from the present record is that, in 1973, appellants were issued an amusement license that authorized them to exhibit adult motion pictures which their patrons viewed in private booths in their adult bookstore. Borough officials apparently regarded this business as lawful under the zoning ordinance and compatible with the immediate neighborhood until July 1976 when appellants repainted their exterior sign and modified their interior exhibition.[8]

---

musical combo that plays music from a stage; a vocalist also performs there on occasion. *Id.*, at 25, 35–36. Capriotti's, a dinner club/discotheque, and Al-Jo's also feature live performances by musical groups. *Id.*, at 22, 36, 55, 58–59. The Borough permits live entertainment in these establishments as a prior nonconforming use.

[5] See *id.*, at 19–20. Appellants' counsel, in his examination of the Borough's building inspector at the Municipal Court trial, attempted to establish that some or all of these establishments had been issued amusement licenses by the Borough. The building inspector, whose duties did not include the issuance or supervision of amusement licenses, was unable to answer counsel's questions. See *ibid.*

[6] See *id.*, at 21, 38.

[7] Counsel for both parties informed the Court at oral argument that a motion picture theater is in operation in Mount Ephraim. See Tr. of Oral Arg. 6, 9, 37–39. The theater apparently is located near and to the east of appellants' bookstore. See *id.*, at 9. According to counsel for the Borough, the theater is permitted as a prior nonconforming use. See *id.*, at 37–39; see also *ante*, at 67, n. 6 (opinion of the Court).

[8] The Borough objected to both the exterior and the interior changes. A substantial part of the proceedings in the Municipal Court and the Camden County Court concerned the repainting of the sign, a dispute

Without more information about this commercial enclave on Black Horse Pike, one cannot know whether the change in appellants' business in 1976 introduced cacophony into a tranquil setting or merely a new refrain in a local replica of Place Pigalle. If I were convinced that the former is the correct appraisal of this commercial zone, I would have no hesitation in agreeing with THE CHIEF JUSTICE that even if the live nude dancing is a form of expressive activity protected by the First Amendment, the Borough may prohibit it.[9] But when the record is opaque, as this record is, I believe the Borough must shoulder the burden of demonstrating that appellants' introduction of live entertainment had an identifiable adverse impact on the neighborhood or on the Borough as a whole. It might be appropriate to presume that such an adverse impact would occur if the zoning plan itself were narrowly drawn to create categories of commercial uses that unambiguously differentiated this entertainment from permitted uses. However, this open-ended ordinance affords no basis for any such presumption.

The difficulty in this case is that we are left to speculate as to the Borough's reasons for proceeding against appellants'

which appellants ultimately won in the state courts. See App. to Juris. Statement 5a–6a.

[9] THE CHIEF JUSTICE states:

"It is clear that, in passing the ordinance challenged here, the citizens of the Borough of Mount Ephraim meant only to preserve the basic character of their community. It is just as clear that, by thrusting their live nude dancing shows on this community, the appellants alter and damage that community over its objections." *Post*, at 86.

The problem with THE CHIEF JUSTICE's analysis, in my judgment, is that "the basic character of [the] community" is not at all clear on the basis of the present record. Although Mount Ephraim apparently is primarily a residential community, it is also a community that in 1973 deemed an adult bookstore that exhibited adult motion pictures, or "peep shows," not inconsistent with its basic character. I simply cannot say with confidence that the addition of a live nude dancer to this commercial zone in 1976 produced a dramatic change in the community's character.

business, and as to the justification for the distinction the Borough has drawn between live and other forms of entertainment. While a municipality need not persuade a federal court that its zoning decisions are correct as a matter of policy, when First Amendment interests are implicated, it must at least be able to demonstrate that a uniform policy in fact exists and is applied in a content-neutral fashion. Presumably, municipalities may regulate expressive activity—even protected activity—pursuant to narrowly drawn content-neutral standards; however, they may not regulate protected activity when the only standard provided is the unbridled discretion of a municipal official. Compare *Saia* v. *New York,* 334 U. S. 558, with *Kovacs* v. *Cooper,* 336 U. S. 77.[10] Because neither the text of the zoning ordinance nor the evidence in the record indicates that Mount Ephraim applied narrowly drawn content-neutral standards to the appellants' business, for me this case involves a criminal prosecution of appellants simply because one of their employees has engaged in expressive activity that has been assumed, *arguendo,* to be protected by the First Amendment.[11] Ac-

---

[10] The open-ended character of the prohibition in the Mount Ephraim Code, see n. 2, *supra,* presents an opportunity for the exercise of just such unbridled discretion. The Borough has, at different stages of this litigation, advanced two different interpretations of that prohibition. According to one, all commercial entertainment is prohibited within the boundaries of Mount Ephraim; according to the other, only commercial live entertainment is prohibited. See *ante,* at 67, n. 6 (opinion of the Court). Appellants have suggested yet a third possible interpretation. They maintain that the prohibition is applied only against live nude dancing.

[11] Like JUSTICE POWELL, *ante,* at 79 (concurring opinion), I have no doubt that some residential communities may, pursuant to a carefully drawn ordinance, regulate or ban commercial public entertainment within their boundaries. Surely, a municipality zoned entirely for residential use need not create a special commercial zone solely to accommodate purveyors of entertainment. Cf. *Valley View Village* v. *Proffett,* 221 F. 2d 412, 417–418 (CA6 1955) (Stewart, J.) (zoning ordinance that provides only

cordingly, and without endorsing the overbreadth analysis employed by the Court, I concur in its judgment.

CHIEF JUSTICE BURGER, with whom JUSTICE REHNQUIST joins, dissenting.

The Borough of Mount Ephraim is a small borough in Camden County, N. J. It is located on the Black Horse Turnpike, the main artery connecting Atlantic City with two major cities, Camden and Philadelphia. Mount Ephraim is about 17 miles from the city of Camden and about the same distance from the river that separates New Jersey from the State of Pennsylvania.

The Black Horse Turnpike cuts through the center of Mount Ephraim. For 250 feet on either side of the turnpike, the Borough has established a commercial zone. The rest of the community is zoned for residential use, with either single- or multi-family units permitted. Most of the inhabitants of Mount Ephraim commute to either Camden or Philadelphia for work.

The residents of this small enclave chose to maintain their town as a placid, "bedroom" community of a few thousand people. To that end, they passed an admittedly broad regulation prohibiting certain forms of entertainment. Because I believe that a community of people are—within limits— masters of their own environment, I would hold that, as applied, the ordinance is valid.

At issue here is the right of a small community to ban an activity incompatible with a quiet, residential atmosphere. The Borough of Mount Ephraim did nothing more than employ traditional police power to provide a setting of tranquility. This Court has often upheld the power of a community "to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-

---

for residential use is not *per se* invalid). Mount Ephraim, however, is not such a municipality.

balanced as well as carefully patrolled." *Berman* v. *Parker*, 348 U. S. 26, 33 (1954). Justice Douglas, speaking for the Court, sustained the power to zone as

> "ample to lay out zones where family values, youth values, and the blessings of quiet seclusion and clean air make the area a sanctuary for people." *Village of Belle Terre* v. *Boraas*, 416 U. S. 1, 9 (1979).

Here we have nothing more than a variation on that theme.

The Court depicts Mount Ephraim's ordinance as a ban on live entertainment. But, in terms, it does not mention any kind of entertainment. As applied, it operates as a ban on nude dancing in appellants' "adult" bookstore, and for that reason alone it is here. Thus, the issue *in the case that we have before us* is not whether Mount Ephraim may ban traditional live entertainment, but whether it may ban nude dancing, which is used as the "bait" to induce customers into the appellants' bookstore. When, and if, this ordinance is used to prevent a high school performance of "The Sound of Music," for example, the Court can deal with that problem.

An overconcern about draftsmanship and overbreadth should not be allowed to obscure the central question before us. It is clear that, in passing the ordinance challenged here, the citizens of the Borough of Mount Ephraim meant only to preserve the basic character of their community. It is just as clear that, by thrusting their live nude dancing shows on this community, the appellants alter and damage that community over its objections. As applied in this case, therefore, the ordinance speaks directly and unequivocally. It may be that, as applied in some other case, this ordinance would violate the First Amendment, but, since such a case is not before us, we should not decide it.

Even assuming that the "expression" manifested in the nude dancing that is involved here is somehow protected speech under the First Amendment, the Borough of Mount

Ephraim is entitled to regulate it. In *Young* v. *American Mini-Theatres, Inc.,* 427 U. S. 50, 62 (1972), we said:

> "The mere fact that the commercial exploitation of material protected by the First Amendment is subject to zoning and other licensing requirements is not a sufficient reason for invalidating these ordinances."

Here, as in *American Mini-Theatres,* the zoning ordinance imposes a minimal intrusion on genuine rights of expression; only by contortions of logic can it be made otherwise. Mount Ephraim is a small community on the periphery of two major urban centers where this kind of entertainment may be found acceptable. The fact that nude dancing has been totally banned in this community is irrelevant. "Chilling" this kind of show business in this tiny residential enclave can hardly be thought to show that the appellants' "message" will be prohibited in nearby—and more sophisticated—cities.

The fact that a form of expression enjoys some constitutional protection does not mean that there are not times and places inappropriate for its exercise. The towns and villages of this Nation are not, and should not be, forced into a mold cast by this Court. Citizens should be free to choose to shape their community so that it embodies their conception of the "decent life." This will sometimes mean deciding that certain forms of activity—factories, gas stations, sports stadia, bookstores, and surely live nude shows—will not be allowed. That a community is willing to tolerate such a commercial use as a convenience store, a gas station, a pharmacy, or a delicatessen does not compel it also to tolerate every other "commercial use," including pornography peddlers and live nude shows.

In Federalist Paper No. 51, p. 160 (R. Fairfield ed. 1966), Madison observed:

> "In framing a government which is to be administered by men over men, the great difficulty lies in this: you

must first enable the government to control the governed; and in the next place oblige it to control itself."

This expresses the balancing indispensable in all governing, and the Bill of Rights is one of the checks to control overreaching by government. But it is a check to be exercised sparingly by federal authority over local expressions of choice going to essentially local concerns.

I am constrained to note that some of the concurring views exhibit an understandable discomfort with the idea of denying this small residential enclave the power to keep this kind of show business from its very doorsteps. The Borough of Mount Ephraim has not attempted to suppress the point of view of anyone or to stifle any category of ideas. To say that there is a First Amendment right to impose every form of expression on every community, including the kind of "expression" involved here, is sheer nonsense. To enshrine such a notion in the Constitution ignores fundamental values that the Constitution ought to protect. To invoke the First Amendment to protect the activity involved in this case trivializes and demeans that great Amendment.