[No. 8306-3-III.  Division Three.  May 10, 1988.]

THE CITY OF PASCO, *Respondent,* v. JOSEPH C. RHINE, *Petitioner.*

*Joseph C. Rhine,* pro se.

*Greg A. Rubstello, City Attorney,* for respondent.

THOMPSON, A.C.J.—Joseph Rhine was found guilty in Pasco Municipal Court of: (1) violating a zoning ordinance prohibiting certain kinds of advertisement of adult motion

pictures on theaters granted nonconforming use permits based on their location, and; (2) two counts of facilitating unlawful public exposure, prohibited by a Pasco municipal ordinance, for putting on a "strip show" at his theater. On appeal to superior court, the court upheld the zoning ordinance violation, but reversed the public exposure convictions. Mr. Rhine seeks review of his zoning ordinance conviction and the City of Pasco seeks review of the unlawful public exposure reversal. We affirm.

Joseph Rhine is the president of Argus Foundation, the lessee of the Liberty Theater in Pasco, Washington. The theater is leased from Playtime Theatres, Inc., and during the time relevant to the appeal primarily showed adult motion pictures.

On November 19, 1979, the Pasco City Council approved a permit for continuance of a nonconforming use, pursuant to Pasco Municipal Code 22.72.020(2).[1] The permit allowed continued operation of the Liberty Theater to end litigation between the City and Playtime Theatres, Inc., in which Playtime had challenged provisions of a Pasco city ordinance concerning the location of adult motion picture theaters. Those ordinances, PMC 22.68.020(i) and (j) and PMC 22.72.020, are identical to the zoning ordinance later upheld by the United States Supreme Court in *Renton v. Playtime*

---

[1] "(2) A use of any building or land which on April 19, 1977, was nonconforming to Ordinance 1849 [prohibiting adult motion picture theaters within certain locations] as passed on April 19, 1977, may be continued upon having an application for continuance approved by the city council as provided below and *upon such terms and conditions as the city agrees.*

"...

"(C) In reviewing the application, the city may consider whether the use may be continued without the significant adverse impact that Ordinance 1849 was intended to prevent and what conditions should be imposed on the use of the property *to reduce the impact of the nonconforming use on the surrounding area* and such other conditions that would serve the public interest in the use of the property. The city may grant the application only if the use may be continued *in such a manner that will substantially reduce any adverse impact of the nonconforming use on the surrounding area.* The city may impose such conditions that will accomplish the same and which will promote the public interest." (Italics ours.)

*Theatres, Inc.*, 475 U.S. 41, 89 L. Ed. 2d 29, 106 S. Ct. 925 (1986).

Among the several conditions contained in the nonconforming use permit were the following:

1. . . . no encasements or other display articles shall be allowed anywhere else on the facade of the building or in any other portion of the outside of the building. . . .

. . .

4. There shall not be visible to passersby standing anywhere outside the building any drawings, pictures, and other illustrative material.

. . .

7. Informational material on the building, including the sign/reader board, shall be limited to the name of the theater, ownership information, a designation or identification that adult films are showing, the days and hours of its operation, and the titles of any films showing or coming attractions. Nowhere on the building visible to passersby standing outside the building shall be any words suggestive of sexual acts except that the permittee shall not have to make changes in the titles if such changes cannot be made without interfering with the copyright name of the motion picture.

The permit was effective until January 1, 1995, unless the building was abandoned or use was voluntarily discontinued for 30 days or more.

In October 1985, Mr. Rhine placed photo display advertisements of X–rated films on the front of the Liberty Theater. The City then cited him for continued operation of an adult motion picture theater contrary to the terms of his nonconforming use permit. On stipulated facts, Mr. Rhine was convicted in Pasco Municipal Court. His conviction was upheld upon appeal to the Franklin County Superior Court.

In addition, Mr. Rhine had been cited by the City for two counts of facilitating unlawful public exposure, PMC 9.10.030. These charges resulted from a live show held at the Liberty Theater in July 1985 where two male and two female performers took their clothes off while dancing to the sound of taped music in front of approximately 50 people in the theater audience. The stipulated facts, consisting

of police reports, reveal that two officers with the Pasco Police Department observed the performance. Before the performance the officers informed Mr. Rhine that if the performers were fully nude as a result of the performance, they and Mr. Rhine would be cited pursuant to the municipal ordinance. The performers did not simulate sexual acts and stayed on a stage at least 18 inches high and at least 6 feet away from the nearest patron. After the show, the citations were issued.

The trial court found Mr. Rhine guilty of two counts of facilitating unlawful public exposure, based upon the stipulated facts. Mr. Rhine appealed. The Franklin County Superior Court reversed Mr. Rhine's convictions on these two counts, finding there was insufficient evidence that "the conduct complained of in the police reports did *not* amount to an 'expressive dance' exempted from the prohibitions in Sections 9.10.020 and .030 of the PMC and that the finding of guilty was not supported by substantial evidence . . ."

### NONCONFORMING USE

The issue in Mr. Rhine's petition for review of the zoning violation is whether PMC 22.72.020 is unconstitutional, as applied to him, based on a violation of his First and Fourteenth Amendment rights to free speech. The United States Supreme Court has repeatedly emphasized, when dealing with challenges to laws restricting freedom of expression, that "each medium of expression presents special First Amendment problems", *FCC v. Pacifica Found.*, 438 U.S. 726, 748, 57 L. Ed. 2d 1073, 98 S. Ct. 3026 (1978). For this reason, analysis begins with a categorization process. Here, the relevant inquiry involves that body of law concerned with regulation of commercial speech.

A distinction exists in First Amendment analysis between commercial and noncommercial speech. *Metromedia, Inc. v. San Diego,* 453 U.S. 490, 505–07, 69 L. Ed. 2d 800, 101 S. Ct. 2882 (1981); *Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 455–56, 56 L. Ed. 2d 444, 98 S. Ct. 1912 (1978). If the restriction being challenged affects commercial speech

only, the First Amendment requirements are less rigorous. *Metromedia,* 453 U.S. at 507; *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n,* 447 U.S. 557, 562 n.5, 65 L. Ed. 2d 341, 100 S. Ct. 2343 (1980). As Justice Stevens noted in *Young v. American Mini Theatres, Inc.,* 527 U.S. 50, 68–69, 49 L. Ed. 2d 310, 96 S. Ct. 2440 (1976), "The measure of constitutional protection to be afforded commercial speech will surely be governed largely by the content of the communication."

█ While no definitive test has been devised to distinguish commercial from noncommercial speech, the Supreme Court has said commercial speech is "expression related solely to the economic interest of the speaker and its audience". *Central Hudson,* 447 U.S. at 561. Another definition is "speech proposing a commercial transaction", *Central Hudson,* 447 U.S. at 562 (quoting *Ohralik,* 436 U.S. at 455–56). *See also Washington Mercantile Ass'n v. Williams,* 733 F.2d 687, 689 (9th Cir. 1984).

Here, the nonconforming use permit prohibited advertising in the form of posters on the outside of the theater. Condition 4 of the permit, which prohibited "any drawings, pictures, and other illustrative material" potentially extends beyond expressions of economic interests or speech proposing commercial transactions. However, the parties stipulated that the ban affected advertising of only those films which were X–rated or "adult" motion pictures. It is apparent this was the City's intent in placing these conditions in the permit. No argument is made that this limiting construction does not cure any potential overbreadth, and Mr. Rhine does not make an overbreadth argument, instead attacking the nonconforming use ordinance as applied to him.

We conclude the City of Pasco intended to reach only those posters and informational materials advertising the X–rated or adult films that were the subject of the original zoning ordinance, not other forms of speech. These advertisements, posters, etc., are as noted by Mr. Rhine "a theater's major advertising resource". As such, they propose

a commercial transaction and are properly classified commercial speech.[2]

   The United States Supreme Court has devised a 4–part test for deciding whether governmental regulation of commercial speech is valid. (1) Is the speech protected by the First Amendment? (2) Does the restriction seek to implement a substantial governmental interest? (3) Does the restriction directly advance that governmental interest? (4) Does the restriction reach no further than necessary to accomplish the interest? *Metromedia,* 453 U.S. at 507; *Central Hudson,* 447 U.S. at 566.

### 1. Protected Speech

No argument is made that these posters are obscene, inaccurate, or propose unlawful activity. The posters are protected by the First Amendment.

### 2. Substantial Governmental Interest

The United States Supreme Court in *Renton v. Playtime Theatres, Inc., supra,* upheld what is conceded by Mr. Rhine to be essentially the identical location restriction ordinance for adult motion picture theaters as the Pasco ordinance here; this ordinance precipitated the need for the nonconforming use permit. In that case, the Court reiterated its holding in *Young v. American Mini Theatres, Inc., supra,* that a governmental classification based on the sexually explicit content of the activity or expression involved, and differing treatment accorded such speech by certain locational restrictions, was a valid time, place, and manner restriction.

   *Renton* also resolved any doubts whether such an ordinance is designed to serve a substantial governmental interest. The Court cited *Northend Cinema, Inc. v. Seattle,*

---

[2]Mr. Rhine cites *Bolger v. Youngs Drug Prods. Corp.,* 463 U.S. 60, 66–67, 77 L. Ed. 2d 469, 103 S. Ct. 2875 (1983) for the proposition that economic motive is not by itself sufficient to turn posters or displays into commercial speech. However, *Bolger* held the combination of (1) advertisement, (2) reference to a specific product, and (3) economic motivation will in combination sustain a conclusion the "speech" is commercial. All three are present in the posters at issue here.

90 Wn.2d 709, 585 P.2d 1153, 1 A.L.R.4th 1284, *cert. denied,* 441 U.S. 946 (1978) as detailing the requisite findings which can be relied upon, even by other Washington cities, as justification for enacting location ordinances aimed at adult theaters. In *Northend,* the City's professed goal of protecting and preserving the quality of its neighborhoods, through effective land use planning, was found to be a substantial and legitimate governmental interest; further, the location of adult theaters had a harmful effect on an area, contributing to neighborhood blight. *Northend,* at 713.

Also, specific to the issues here, *Northend* held the benefit to the public welfare through termination of the nonconforming use of the adult theater within 90 days outweighed any harm to the theater owners. *Northend,* at 722. There is no evidence in this case tending to show a contrary conclusion as to the Liberty Theater. PMC 22.72-.020(2) indicates specifically the conditions are imposed "to reduce the impact of the nonconforming use on the surrounding area . . ." We hold the advertising restrictions placed on the continuation of this nonconforming use involve the same substantial interest of mitigating the secondary impacts of adult theater location as upheld in *Northend* and *Renton.*[3]

### 3. Advancing the Governmental Interest

*Renton* restated the *Young v. American Mini Theatres, Inc., supra,* admonition that, "[T]he city must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems", *Renton,* 475 U.S. at 52 (quoting *Young,* 427 U.S. at 71). If the City could have forced Mr. Rhine to terminate his nonconforming use, as it could have under the same ordinance giving the Council authority to allow continuation subject to conditions, PMC

---

[3]Mr. Rhine does not challenge the actual authority of Pasco to place conditions on the issuance of a nonconforming use permit, only the validity of those conditions.

22.72.020, then its attempt to mitigate the continued existence of the theater by regulating the manner with which Mr. Rhine externally communicated his commercial message is permissible. There is a rational relationship between limiting advertising, as Pasco has done, and the substantial interest it has in mitigating the secondary impacts of the theater's location in an area not suitable for such theaters. *See SDJ, Inc. v. Houston,* 837 F.2d 1268 (5th Cir. 1988); *Borrago v. Louisville,* 456 F. Supp. 30, 32 (W.D. Ky. 1978).

### 4. Least Restrictive Means

Mr. Rhine may continue to advertise in any fashion the print and electronic media will permit. He can also advertise on the theater marquee the name of the theater, that adult films are showing, the titles of any films currently showing and coming attractions. Adult theaters located in areas allowed by zoning ordinance may utilize posters of the type restricted on Mr. Rhine's theater. Most importantly, he can continue to operate the theater, even though the City could have lawfully forced him to discontinue his nonconforming use. *See Northend,* at 720; *Seattle v. Martin,* 54 Wn.2d 541, 342 P.2d 602 (1959); *Asia v. Seattle,* 4 Wn. App. 530, 532, 482 P.2d 810 (1971). *See also Dumas v. Dallas,* 648 F. Supp. 1061, 1071 (N.D. Tex. 1986), *aff'd sub nom. FW/PBS, Inc. v. Dallas,* 837 F.2d 1298 (5th Cir. 1988). As in *Metromedia,* 453 U.S. at 508: "The city has gone no further than necessary in seeking to meet its ends. Indeed, it has stopped short of fully accomplishing its ends: It has not prohibited all billboards . . ." *Compare Basiardanes v. Galveston,* 682 F.2d 1203, 1219 (5th Cir. 1982) (a ban on outside advertising serves a substantial governmental interest, and is permissible, but the total prohibition of even a simple sign announcing the theater's existence went too far).

Mr. Rhine's citation of *Linmark Assocs. v. Willingboro,* 431 U.S. 85, 52 L. Ed. 2d 155, 97 S. Ct. 1614 (1977) is not persuasive. In that case, the Court held banning "For Sale" signs on real estate was unconstitutional, noting the sellers'

alternatives for communicating the commercial message were wholly inadequate. However, in *Linmark,* the location of the signs was not related to the substantial governmental interest at stake, which was to slow "white flight" to the suburbs. Only the content was related to that purpose. Here, the content *and* location are both the subject of concern; the content *because* of the location. The City did not try to ban all posters advertising adult motion pictures, only those appearing at locations validly classified as nonconforming uses. Nor did the City seek to prohibit the showing of these films, based on their content. We hold the conditions placed on the continued operation of the Liberty Theater, while they are content–based restrictions on protected speech, nevertheless are a valid exercise of the City's police powers.

### NUDE DANCING BAN

In its cross petition, the City contends the superior court erred in reversing Mr. Rhine's convictions for two counts of facilitating unlawful public exposure. Mr. Rhine appealed his convictions to the superior court pursuant to RALJ 2.2. His notice of appeal put at issue the constitutionality, both facially and as applied, of the relevant ordinance. He also argued the ordinance violated his rights to due process by shifting the burden of proof to him. That ordinance defines "unlawful public exposure" as:

(A) A public exposure of any portion of the human anus or genitals;
(B) A public exposure of any portion of the female breast lower than the upper edge of the areola; or
(C) A public exposure consisting of touching, caressing or fondling of the male or female genitals or female breasts, whether clothed or unclothed.

PMC 9.10.010(5). The ordinance exempted "expressive dance", defined as:

[A]ny dance which, when considered in the context of the entire performance, constitutes an expression of theme, story, or ideas, but excluding any dance such as, but not limited to, common barroom type topless dancing which,

when considered in the context of the entire performance, is presented primarily as a means of displaying nudity as a sales device or for other commercial exploitation without substantial expression of theme, story or ideas.

PMC 9.10.010(2). The ordinance also exempted nudity in plays, operas, musicals, or other dramatic works; classes, seminars, or other lectures which are conducted for scientific, medical or educational purposes; and locker room nudity. PMC 9.10.040. In addition, the ordinance provided an affirmative defense to prosecution:

[T]hat the nudity or other public exposure, when considered in the context in which presented, provided actual literary, artistic, political or scientific value and was not provided for commercial or sexual exploitation or with an emphasis or an appeal to a prurient interest.

PMC 9.10.060.

The Superior Court reversed the convictions on the basis that, after reviewing the record, there was insufficient evidence to show the nude dances were *not* "expressive" dances, exempted from the prohibitions of PMC 9.10.030, and that the finding of guilty was not supported by substantial evidence.

An identical ordinance in Pierce and Snohomish Counties was found unconstitutional in *BSA, Inc. v. King Cy.*, 804 F.2d 1104 (9th Cir. 1986). We likewise hold the ordinance in question unconstitutional for the same reasons as the Ninth Circuit Court of Appeals.

■ First, the court correctly determined this ordinance expressly prohibits all common barroom type topless dancing without any requirement the dancing be obscene or "patently offensive" under the obscenity standards set forth by the United States Supreme Court in *Miller v. California*, 413 U.S. 15, 37 L. Ed. 2d 419, 93 S. Ct. 2607 (1973). The ban therefore extends beyond unprotected "obscenity" into the area of protected First Amendment activity. *See Schad v. Mount Ephraim*, 452 U.S. 61, 68 L. Ed. 2d 671, 101 S. Ct. 2176 (1981); *Doran v. Salem Inn,*

*Inc.*, 422 U.S. 922, 932, 45 L. Ed. 2d 648, 95 S. Ct. 2561 (1975). In *O'Day v. King Cy.*, 109 Wn.2d 796, 749 P.2d 142 (1988), the Washington Supreme Court construed a similar statute as constitutional because the statute specifically limited its reach to *obscene* unprotected conduct, and contained a proper definition of obscenity; the ordinance in *O'Day* did not ban all common barroom type topless dancing, as here.

Next, *BSA* held Pierce and Snohomish Counties had failed to show their prohibition against nude dancing furthered a substantial governmental interest unrelated to suppression of free expression, and had also failed to show the governmental interest which was alleged could not be served by a means less intrusive on First Amendment expression. *BSA*, 804 F.2d at 1108–09. Here, there is no evidence in the record to support either criteria.

Finally, the court held the ordinance was facially overbroad, and could not be rehabilitated by a construction which would provide safeguards for unintended defendants. The court specifically held the affirmative defense section, identical to PMC 9.10.060, could not be utilized to "save" the ordinance and limit its reach, because this section unconstitutionally shifted to the defendant the burden of proving whether the activity appealed to prurient interests. *BSA*, 804 F.2d at 1110. *Cf. O'Day v. King Cy., supra.* There is no limiting construction possible to cure the overbreadth infirmities of Pasco's nude dancing prohibition, as was possible in *O'Day.*[4] *See O'Day,* at 806.

Pasco contends this court need not follow *BSA.* It argues the Washington Supreme Court has ruled to the contrary in *Kitsap Cy. v. Kev, Inc.*, 106 Wn.2d 135, 720 P.2d 818 (1986); *Curtis v. Seattle*, 97 Wn.2d 59, 639 P.2d 1370 (1982); and *Seattle v. Buchanan*, 90 Wn.2d 584, 584 P.2d 918 (1978). All three are distinguishable, and did not

---

[4]*O'Day* also noted article 1, section 5 of the Washington State Constitution demands closer scrutiny, and is less tolerant, where overbreadth is argued. *O'Day,* at 803–04.

involve a total ban on barroom type topless dancing or nonobscene nude dancing, as is the case with Pasco's ordinance. In addition, we note *O'Day,* at 809, cites *BSA* approvingly:

Unlike similar local regulatory regimes that have been invalidated, the stage requirement [in the *O'Day* case] does not prohibit nude entertainment. *See, e.g., Doran v. Salem Inn, Inc.,* 422 U.S. 922, 45 L. Ed. 2d 648, 95 S. Ct. 2561 (1975); *BSA, Inc. v. King Cy.,* 804 F.2d 1104 (9th Cir. 1986) (*invalidating a Pierce County ban on nude dancing*) . . .

(Italics ours.)

In summary, we affirm Mr. Rhine's conviction for violation of the zoning ordinance prohibiting advertisement of adult motion pictures by way of external posters, and affirm the superior court's reversal of Mr. Rhine's municipal court conviction for two counts of facilitating unlawful public exposure.

GREEN and MUNSON, JJ., concur.