STATE of Tennessee ex rel. Eddie SHAW, Commissioner, Department of Transportation, Plaintiff-Appellee,

v.

Ida Lou Carter SHOFNER, City of Fayetteville, Tennessee, Edison Burton d/b/a Three Point Gulf, Defendants,

J. C. Moores, d/b/a Moores Oil Co., Defendant-Appellant.

Court of Appeals of Tennessee, Middle Section.

July 28, 1978.

Brooks McLemore, Jr., Atty. Gen., Robert J. Ames, Asst. Atty. Gen., H. Donald Holman, Fayetteville, Milton Wauford, Nashville, for plaintiff-appellee.

James R. Thompson, Fayetteville, John Shofner, Shelbyville, for Ida Shofner.

Robert W. Stevens, Fayetteville, for Moores Oil Co.

## ABRIDGED OPINION

TODD, Judge.

*With the concurrence of participating judges, the original opinion has been abridged for publication.*

This is an eminent domain proceeding to assess compensation to an owner, lessee, and sub-lessee, for taking a part of a filling

station and restricting access to the property by erection of curbs and sidewalks.

One of the defendants, J. C. Moores, lessee of the property, has appealed from jury award of $2,000.00 damages to the appellant's leasehold interest. Other defendants have not appealed.

The property in question is at the corner of State Route 10 (U.S. 64) and Astrid Street in Fayetteville, Tennessee. At this point, U.S. 64 runs generally northeast and southwest and Astrid Street extends in a southeasterly direction from the intersection. The property is on the southeast side of U.S. 64 and on the southwest side of Astrid Street.

The natural grade of U.S. 64 and the adjoining property is downward moving from southwest to northeast, so that the lowest part of the property is at the intersection of U.S. 64 and Astrid Street and the ground level rises to the southwest of the intersection. Along the southeasterly line of the property at the border of Astrid Street is a stone retaining wall several feet high.

For many years, the property has been used as a filling station, and it is improved with the customary filling station building, underground storage tanks and two "gas islands", each of which supports two gasoline pumps.

Prior to the taking these two gasoline islands were located eight feet (8') and nine and one-half feet (9½') from the edge of the highway right of way, but this close proximity was of little or no consequence because the travel lanes of the highway did not occupy the entire right of way, and the remainder of the right of way was an "asphalt shoulder", so that the paved surface was continuous from the "gas islands" to the travel lanes, and the exact location of the edge of the right of way was disregarded.

Since there was no curbing or sidewalk, access to the filling station from U.S. 64 was most convenient and continuous throughout the entire 125 feet frontage of the property. The contour of the property at the intersection had been graded and paved so that vehicles might enter the station at the very apex of the intersection of Astrid Street. For this purpose, the stone retaining wall began several feet back from the highway frontage.

The highway improvement project involved two major effects upon the subject property.

First, in order to "round the corner" at U.S. 64 and Astrid Street into a gentle curve, a small, triangular tract was taken. The tract extended from the intersection, where it was eighteen feet (18') deep to a point forty feet (40') from the intersection where it had no depth at all. The third side of the triangle, adjoining the residue of the property measured forty-five feet (45'). Thus the triangle measured forty feet (40') along the old right of way line of U.S. 64, eighteen feet (18') along the edge of Astrid Street, and forty-five feet (45') along the new right of way line of U.S. 64.

The taking of this triangle had two adverse effects upon the convenience of access to the filling station. It consumed the area near the intersection where vehicles could formerly enter and leave the filling station, and it substantially narrowed the space between one of the gas islands and the (new) edge of the right of way.

In addition, the construction plans involved the construction of curbs and sidewalks along most, but not all, of the frontage of the service station. Vehicles cannot enter the station across the curbs which are six inches (6") above the level of the highway. However, the level of the top of the curbs and of the adjoining sidewalk corresponds to the level of the filling station drive.

Beginning at the westerly corner of the property farthest from the intersection, there is no construction for 20.5 feet of the frontage. That is, for this distance, access from the street to the station is unchanged. At this point (20.5 feet from the western corner) the curb and sidewalk begins. The curb begins at zero height and gradually rises for a distance of nine feet (9') to its full height of six inches (6"). At this point,

the curb is interrupted for a distance of twenty feet (20′) to provide a driveway across the sidewalk into the station twenty feet (20′) wide. Beyond this driveway is a twenty foot (20′) section of curbing followed by another driveway twenty feet (20′) wide. Beyond this latter driveway, the curbing is continuous to and around the corner of U.S. 64 and Astrid Street. On Astrid Street, the curb and sidewalk ends eight and one-half feet (8½′) from the beginning of the stone retaining wall previously mentioned.

Thus, as compared to the previous 125 feet of continuous access to U.S. 64, there remains three (and possibly four) separate opportunities for access. The first is the 20.5 feet of frontage unaffected by the construction increased somewhat by the gradually rising curb which adjoins it. The second and third are the two twenty foot (20′) driveways separated by twenty feet (20′) of intervening curb. The possible fourth is a proposed new access to Astrid Street in the eight and one-half foot (8½′) space between the end of the curb and the beginning of the stone wall. Admittedly, this latter proposal is complicated by the narrowness of the space, the steep grade to Astrid Street and the fact that a street sign is planned for this area.

A considerable amount of testimony was devoted to efforts to show that the three (possibly four) driveways provided access as convenient as formerly and that the space between the sidewalk and gas islands was adequate for vehicles being serviced.

For the western gas island, this was largely proved for two reasons. The first 20.5 foot unimproved space and the constructed driveways provide reasonably good access, and the sidewalk is no nearer this island than the old right of way line. No property was taken at this point in the frontage, so that the nearer edge of the sidewalk and old right of way line are identical at this point.

As to the other gas island, the access is definitely less convenient for two reasons. The constructed driveways do not provide convenient access. The driveways are immediately in front of the gas islands. A vehicle entering a driveway cannot move directly to the adjacent gas island, but must proceed beyond the island and reverse in order to get near the island. In respect to the second island this inconvenient procedure must occur on arrival and when leaving, that is, after being serviced, the vehicle is required to move in reverse for a distance before it can exit through the driveway.

The other inconvenience at the second gas island is the fact that a part of the taking extends in front of it and thus narrows the space between it and the right of way (sidewalk). At its narrowest point this space was estimated at six and one-half feet (6½′).

In order to adjust to the problems just mentioned, the State's witness (not an expert in filling station operation) insisted that vehicles could enter one of the front drives, proceed *behind* the gas island, between it and the filling station building where the space is some twenty-five feet (25′) wide. After servicing, it is projected, the vehicle could leave by proceeding down a ramp (to be constructed) through the eight and one-half feet (8½′) opening between the end of the wall and the end of the curb at the corner to Astrid Street. The projected cost of building the ramp to Astrid Street was $2,000.00.

Michael Choate, right of way engineer, gave details of the taking and construction and identified pictures showing vehicles in the filling station with temporary curbs in place as planned. Mr. Choate also testified he had worked at a filling station which had twenty foot (20′) entrance drives. The other witness for the State was William Mercer, a professional real estate appraiser, who testified that the value of the entire property was $28,925.00, the value of the land taken was $196.00, the value of a "construction easement" was $89.00 and that the incidental damages were limited to "cost to cure", consisting of the $2,000.00 cost of constructing the ramp to the lower level of Astrid Street. No explanation was given of how the ramp could be built or used with a traffic sign erected in the center of the space.

Appellant, Mr. Moores, testified that he had leased the property since 1941, had built the station and had sub-leased the property at a profit ever since; that he had a lease expiring October 31, 1976, at $175.00 per month; that the lease contained an option for a five (5) year renewal; that the average gross rental received for the preceding twenty (20) months was $698.59 per month, rendering him a profit of $523.59 per month; that the construction destroyed the usefulness of the property as a filling station and he did not renew the lease.

H. L. Noblitt, a former gasoline distributor, testified that the property had been worth $85,000.00, but the construction would destroy 85% of the value for use as a filling station. A. G. Jennings, a gasoline distributor and former real estate agent testified the value of the property would be reduced from $80,000 to $17,500 by the construction. Hillard Parsons, Jr., a gasoline distributor, testified the property was worth $80,000 and that the construction "would almost kill it for a gasoline station."

The jury awarded the owner $1400.00 for the land taken and $10,000.00 as incidental damages to the remainder. There is no appeal from this portion of the judgment.

The jury awarded Mr. Moores, the lessee—sub-lessor $2,000.00. From this portion of the judgment, Mr. Moores has appealed.

The first two assignments of error are as follows:

## I.

"The court erred in not granting appellant a new trial or suggesting an additur.

## II.

The verdict was grossly inadequate, irreconcilable with the proof, and wholly unfair and unreasonable, all as more particularly appears in the accompanying brief."

In support of these assignments, appellant makes five insistences.

The first three insistences are that the verdict was inadequate, grossly inadequate and unsupported by any evidence as to amount.

Whether the verdict is adequate or inadequate, or whether it is supported by evidence depends upon the finding of fact as to whether the theory of the State or the theory of appellant is correct. If, as insisted by the State, the usefulness of the property as a filling station was not impaired by the construction (except by the necessity of constructing the $2000 ramp) then the verdict is supported by evidence and the amount is not inadequate. One of the witnesses for the State, Mr. Choate, did testify from his former experience as a filling station employee that the construction did not seriously impair the usefulness of the property as a filling station; but his testimony does not impress this Court as being well founded based upon the details heretofore discussed. Mr. Mercer, with no experience in the design or operation of a filling station, was allowed to testify as an expert on the subject of curative alteration. This Court is not impressed with the weight of the testimony just mentioned; but, on appeal from a jury verdict, this Court is not permitted to reweigh the evidence.

Moreover, the particular issue under discussion is one about which ordinary citizens would be competent to form an opinion without benefit of competent expert testimony. That is, jurors operate vehicles in and out of filling stations and see others do so, hence they would be competent to make some judgment upon the convenience or inconvenience of a filling station and the probability that the public would patronize it.

It is significant that appellant's witnesses did not undertake to assess the reduction in rental value of the premises, but confined themselves to the matter of the usefulness of the property as a filling station (and no other purpose). It is well established that the measure of damages for taking is the fair value of property (or interest therein) taking into consideration

all of its usefulness for all purposes. It might well be argued that the appellant, having constructed the filling station facilities on the leased land, could not possibly find other profitable uses for the property as it existed, but this aspect of the matter was not touched upon in the evidence.

■ It is argued by appellant that the jury rejected the theory of the State that the incidental damages were limited to "cost to cure" of $2,000.00, because there was an award of $10,000.00 incidental damages to the property owner. The jury is not required to accept or reject in toto the theory of either party, but may arrive at its own concept of truth and justice from the evidence. In so doing, juries seldom adopt the exact testimony of any particular witness.

■ In essence, the verdict of the jury was for a total of $12,000.00 incidental damages, of which $10,000.00 was awarded to the owner and $2,000.00 was awarded to the tenant (appellant). Evidently, the jury found that the usefulness of the filling station had been impaired to a greater extent than shown by the State, but to a lesser extent than insisted by appellant. The award of $12,000.00 was six times that proposed by the State's witness. Evidently, the jury considered that the decreased usefulness should be allocated in accordance with time of occupancy—five years to tenant, and an indefinite number of years thereafter to the owner.

Even though this Court is not satisfied with the amount of a verdict, it has no authority to suggest an additur to correct the failure of the Trial Judge to do so. T. C. A. § 20–1330; *Loftis v. Finch*, Tenn.Ct. App. 1972, 491 S.W.2d 370. Nor is this Court authorized to reverse for a new trial for dissatisfaction with the amount of a verdict. *Nethery v. Hornbuckle*, Tenn.Ct. App. 1971, 484 S.W.2d 552.

■ The dissatisfaction of this Court with the amount awarded to appellant does not rise to the standard of "shocked conscience" or "gross inadequacy" or obvious prejudice or caprice of the jury, hence there can be no reversal on any of these grounds. This is especially true because of the procedural posture of the case.

■ Appellant concedes that the "unitary rule" is the law of Tennessee. That is, compensation for condemnation cannot exceed the fair market value of the property taken, and the total awards to various parties for their several interests in the property may not exceed the value of the property.

■ Applying the "unitary rule" to the present case, the total of the awards to the owner and the tenant for incidental damages cannot exceed the actual incidental damages sustained by the property. The jury has found the total to be $12,000.00, and has allocated $10,000.00 to the owner and $2,000.00 to the tenant. The owner has not appealed, nor was the owner named in the appeal bond, hence the owner is not before this Court on this appeal. The $10,-000.00 judgment in favor of the owner has thus become final and is not subject to disturbance on appeal. The only theory upon which a new trial could be granted to appellant would be a finding that the $12,-000.00 aggregate incidental damages were so grossly inadequate as to shock the conscience of the Court, thereby to justify a remand for new trial with opportunity for a finding of larger total incidental damages and corresponding increase in the compensation of appellant without disturbing the award to the owner. For a discussion of this thorny problem, see *State v. Hurt*, 63 Tenn.App. 689, 478 S.W.2d 775 (1971).

This Court is not so dissatisfied with the total award of incidental damages as to take the unusual action just described.

The first three assignments of error are respectfully overruled.

■ Where the appellate court is dissatisfied with the amount of an award, there is

imposed upon the appellate court more imperatively the duty of scrutinizing the incidents of the trial and other errors assigned in the record. *Huckett v. Brown*, 49 Tenn. (2 Heisk) 264 (1871).

■ Although not assigned as error, it is noted that the Trial Judge refused to allow the State to introduce in evidence an amended construction plan showing that, after the "date of taking" but before the trial, the State had changed the width and arrangement of entrances into the filling station. To the inexpert eye of this Court, the new plan appears to aggravate rather than relieve the problem created by the construction. However, it was insisted before the Trial Judge that the amended plan would improve access to the filling station.

It would have been better procedure to admit the evidence in order that the jury might have a better knowledge of the actual construction, rather than to assess compensation for construction which was merely proposed and never carried out. In at least one unreported case, this Court has faced the situation where plans of a State highway were seriously changed to the detriment of the property owner after the conclusion of eminent domain proceedings. In said case, it was held that such change of plans give right of compensation under inverse condemnation, but the statute had expired for filing such. Also in said case, there was a serious lack of evidence of the actual plan presented to the trial court at the first trial.

■ In eminent domain proceedings in which the nature of the planned improvement is material, it is better practice to require the condemnor to exhibit to its complaint a detailed plan of the improvement which will thereby become a permanent record of the court. Such plan should be incorporated into the final judgment by reference, so that the rights of the parties may be specifically defined, both as to extent of taking and extent of incidental damages incident to the nature of the improvement.

■ Consistent with the practice just discussed, the parties should be allowed latitude of amendment and proof to enable the court as nearly as possible to know and consider the exact situation which will face the property owner *after* the improvement has been completed.

■ In the present case, the exclusion of the plan was not reversible error per se, and does not appear to have prejudiced appellant in respect to the amount of the verdict. If construction took place which was not described to the jury in this case, then the rights of aggrieved parties lie in an action in inverse condemnation.

Appellant's fourth insistence is that the jury disregarded the instruction of the Trial Judge. Appellant does not cite the instruction in question nor argue the proposition.

Appellant's fifth insistence is that the verdict is inconsistent. The basis of this argument is that the jury was obliged to award "all or nothing"; that is, that the jury, having found that the filling station was "ruined", were obliged to award the value of the lease as testified by appellant and his witnesses. As previously discussed, the jury is not so strictly limited in its prerogatives.

Appellant's sixth insistence is that, "the verdict indicated that the jury was confused, as more particularly appears in the brief accompanying these assignments."

The "brief accompanying these assignments" consists of four propositions of law supported by authorities; eleven propositions of fact supported by citations to the record, and three pages of argument, but the nature of the alleged confusion of the jury is not mentioned.

It is true that the jury did not accept or adopt the evidence, theory or argument of either party; but, as heretofore discussed, the jury is not obliged to do so and is not necessarily "confused" because it finds the truth to be somewhere between the extremes of the evidence presented by the parties.

Had the members of this Court been sitting on the jury, the result might well have been otherwise. Had a member of this Court been sitting as trial judge, the verdict might well have been set aside because of disagreement as thirteenth juror. However, these possibilities do not alter the fact that the verdict of the jury, approved by the Trial Judge, is beyond disturbance by this Court except for reversible error by the Trial Judge or capricious verdict of the jury, neither of which are found in this record.

The judgment of the Trial Court is affirmed. Costs of this appeal are taxed against appellant.

Affirmed.

SHRIVER, P. J., and DROWOTA, J., concurs.