LAND ASSOCIATES, a limited partnership; and Airport Land, Inc., a general partnership, Plaintiffs,

v.

METROPOLITAN AIRPORT AUTHORITY and The Metropolitan Government of Nashville and Davidson County, Tennessee, Defendants.

No. 82–3085.

United States District Court,
M. D. Tennessee,
Nashville Division.

Aug. 18, 1982.

Joseph Lackey, Jr., Nashville, Tenn., for plaintiffs.

David T. Hooper, Larry Stewart, Nashville, Tenn., for Metropolitan Airport.

Peter Curry, Metro Legal Dept., Nashville, Tenn., for Metropolitan Government.

## MEMORANDUM

WISEMAN, District Judge.

This case is before the Court on motion to dismiss filed by the defendants under Rules 12(b)(1) and 12(b)(6), F.R.Civ.P. Oral arguments were heard on the motion, and the Court took the matter under advisement.

The plaintiff, Land Associates, is a limited partnership formed pursuant to the statutes of Tennessee which executed a general and limited partnership agreement on November 17, 1970, with Airport Land, Inc., also a plaintiff corporation, as the general partner. There are approximately fifty limited partners who have been admitted from time to time since 1970. The plaintiff partnership owned a tract of land of approximately thirty-five acres in Davidson County near the Metropolitan Airport.

The defendant Metropolitan Airport Authority was created by the Tennessee legislature in 1970. The functions of the Authority were to operate the Metropolitan Airport of Nashville and Davidson County, and it was given the right to own and maintain properties and do all things necessary in conjunction with carrying out the operations of the Metropolitan Airport. The Authority did not have the power of eminent domain, but this power was reserved to the Metropolitan Government of Nashville and Davidson County after receiving appropriate approval from the Metropolitan Council, the legislative branch of government.

Defendant Metropolitan Airport Authority in 1970 filed a Master Plan setting out the present and future plans of operation of the Metropolitan Airport and indicating that there would be expansions of the Airport in and about the area of Donelson Pike. Thereafter, plaintiff partnership was formed and purchased the thirty-five acres of land for the sum of $6,000 per acre. The partnership purchased the property on the belief that it would ultimately be developed in conjunction with the new and expanded Airport. Subsequent to the purchase of the property by plaintiffs, the Airport Authority began consideration of plans that would expand the Airport further and possibly acquire the thirty-five acres owned by the plaintiffs.

In June of 1973, an attorney for the Airport Authority advised one of the principals of the plaintiff that it would not be to the Airport's advantage nor to the plaintiffs' advantage for major construction to be undertaken if it turned out that the property would subsequently be needed. The attorney went on to state, however, that the plaintiffs should not cease to make plans.

In the Spring of 1974, steps were taken by the plaintiffs to get their property zoned from Residential D and Agricultural to Commercial. The necessary hearings were had before the committees of the Metropolitan Council and governmental agencies to effectuate this zoning change. In June of 1974, the plaintiffs found that some members of the Metropolitan Council had been contacted by representatives of the Airport Authority opposing the zoning change. Subsequently, two of the principals of the plaintiffs met with the attorney for the Airport Authority and the Executive Director of the Airport Authority and were advised that the Airport Authority would in the future possibly need the property and that the matter was being studied. On July 2, 1974, and July 9, 1974, the Metropolitan Council adopted the zoning ordinance on first and second readings respectively. At this point the proposed zoning change had been approved by the Planning Commission of the Metropolitan Government, and was referred to the Planning Committee of the Metropolitan Council after having passed second reading. The Planning Committee of the Council approved the ordinance, six in favor, none against and two abstentions. On July 16, 1974, the bill was voted on by the Metropolitan Council, sixteen in favor and none against. However, the bill did not receive the necessary twenty-one votes as required to have a constitutional majority and was referred to the Metropolitan Zoning Committee of the Council. Later, the

bill was brought back out of committee after having approval by five in favor and none against and went back on the floor of the Metropolitan Council on September 3, 1974, where it received twenty yes votes, five noes, and nine abstentions; once again, not receiving the required twenty-one votes. At this point the bill was referred back to the Metropolitan Planning Commission. During this period of time, representatives of the Airport Authority were publicly urging that the Council not allow zoning changes east of the Airport.

Subsequently, the bill was brought back up for reconsideration to rezone said property and the ordinance passed through the necessary committees and all three readings of the Metropolitan Council. This time it passed on third reading with the necessary votes; however, the ordinance was vetoed by the then-Mayor Beverly Briley. In speeches to the Metropolitan Council, councilmen told the Council not to override the Mayor's veto on the zoning change because, if the veto was overridden, the increase in cost to the Metropolitan Government would be substantial when and if the property was acquired by the Airport Authority for its expansion program. The Council did not override the Mayor's veto, and the zoning remained Agricultural.

In February of 1976, an inverse condemnation suit was filed by the plaintiffs against the defendants alleging that there had been a taking of their property. This cause was not brought to trial, and in November of 1977 the Metropolitan Government filed its action for condemnation of the property. Said case was tried in March of 1980 and the plaintiffs were awarded approximately $10,500 per acre. This award was based on the doctrine applied in the State of Tennessee as to the fair market value of the property as of the date of taking in November of 1977. Under the laws of the State of Tennessee this jury was not allowed to consider the value of the property based upon a commercial zoning and therefore, the jury was limited to a consideration of the zoning as of the date of taking. The defendant, Metropolitan Government, appealed the finding of the jury to the Court of Appeals contending that the trial court erred in the admission of certain evidence and that the award of the jury was not supported by the evidence.

Plaintiffs did not appeal from this verdict of the jury. The opinion of the Court of Appeals is instructive:

The first witness for the owners was David Lose who testified that he was "one of the parties that originally purchased the land." The record does not disclose whether he retains an interest in the land and, if so, to what extent. A question seeking such information was withdrawn after counsel for appellant objected. The witness was treated as one of the owners. He testified the land was worth $18,000 per acre. He described its potential use for industrial purposes and stated that it was not useful for other purposes.

The next witness was Frank Brabson, one of the owners, who did not venture an opinion of value.

The next witness was William D. Schock, the official in charge of land acquisition for Airport Authority who ventured no opinion of value.

James Graham, director of the Aviation Authority, ventured no opinion of value.

Leon Bass, a real estate appraiser, expressed an opinion based upon all uses and potential uses of the land, of $14,000 per acre. He testified of its potential commercial or industrial use and stated that for this purpose it was worth $25,000 to $50,000 per acre. However, said he, since the zoning would have to be changed, his appraisal was only $14,000 per acre.

Norman Hall, an appraiser, testified that the property was suitable only for residential purposes and was worth $6,000 per acre.

David Adkisson, an appraiser, testified that the property had some potential for commercial and industrial use and valued it at $5,500 per acre.

Douglas Smith, an appraiser, testified that potential uses of the property includ-

ed commercial and industrial use and valued it at $5,000 per acre.

The verdict of the jury reflected a value of $10,500 per acre.

Appellant would have this Court exclude the testimony of Mr. Lose, one of the owners, who, it is alleged, based his value solely upon potential industrial use. Mr. Lose testified that if zoned industrial and commercial, the property would be worth $35,000 to $70,000 per acre, but that with its present zoning it was worth $18,000 per acre.

Likewise, appellant would have this Court exclude the testimony of Mr. Bass who valued the property at $25,000 to $50,000 per acre for commercial-industrial use, but fixed its actual value at $14,000 per acre because not zoned commercial-industrial.

It is, of course, axiomatic that the value of land may not be set at the value which it would have for its highest and best use only. The reason for this is that the use of the land for such highest and best use or sale for such purpose may never occur or, if it occurs, such use may become impractical. Stated in other words, there is no certainty that land will always be applied to its highest and best use. If not, it must be applied to some lesser use. *Accordingly, the true value of land must be related to all of its possible uses with due regard to the possibility and probability of such use.*

In the present case, both Mr. Lose and Mr. Bass anticipated optimistically that the land could and probably would be applied to commercial or industrial use, for which they estimated values of from $35,000 to $70,000 and $25,000 to $50,000 per acre. However, neither witness placed such an actual value upon the land. Considering the probabilities of highest and best use (and probabilities of other lesser uses) they fixed such lower values of $18,000 and $14,000 per acre.

This Court does not interpret the testimony of Mr. Lose or Mr. Bass to indicate that either of them adopted an unlawful criterion for the actual value of the land.

The verdict is within the range of reasonableness established by creditable proof. Having been approved by the Trial Judge, it is not subject to being disturbed by this Court. *Smith v. Shelton,* Tenn.1978, 569 S.W.2d 421; *State ex rel. Shaw v. Shofner,* Tenn.App.1978, 573 S.W.2d 169. (emphasis added)

Opinion of Court of Appeals of Tennessee, March 13, 1981.

The opinion of the Court of Appeals was filed on March 13, 1981, and the suit in this Court was filed on January 29, 1982.

The gravamen of plaintiffs' suit in this Court is that the Airport Authority froze the zoning of their property to enable them to buy the property at an agricultural price rather than under commercial zoning, that this amounted to a taking within the meaning of the United States Constitution without just compensation in violation of the Fifth and Fourteenth Amendments of the United States Constitution. Plaintiffs sue for the difference between what they received at the hands of the jury and the Tennessee Court of Appeals and $50,000 per acre, which they allege would have been the value of the property in the absence of the alleged conspiracy to retain the property at agricultural or residential zoning.

To this action defendants insist that the Court lacks jurisdiction over the subject matter, that the complaint fails to state a claim upon which relief can be granted, and that the action should be dismissed as being barred under the doctrines of res judicata, the statute of limitations, waiver, estoppel, and laches.

This matter has been in dispute since 1974 and in litigation since February 1976. The conspiratorial actions of the Airport Authority, the Metropolitan Council, and the Mayor alleged by the plaintiffs to have unlawfully deprived them of the beneficial use of this land took place in 1974 and 1975. In plaintiffs' first suit brought in state court February 27, 1976, they alleged that the defendants had "willfully, wrongfully, arbitrarily, illegally and in concert and collusion with each other have suppressed, depressed, deflated the value of said property

and have actively conspired to freeze the zoning on said property and have taken and are depriving the owners of their constitutional right to use and develop said property to its highest and best use."

In plaintiffs "More Definite Statement" filed May 27, 1976, they alleged: "Said action of taking property from a private owner without due process of law and just compensation is in violation of the Constitution of the United States and the State of Tennessee."

In an amended complaint filed August 6, 1976, after recounting all of the facts which are the basis of the suit in this Court, plaintiffs stated: "Said action of taking property from a private owner without due process of law and just compensation is in violation of the Constitution of the United States and the State of Tennessee. Those individuals acting as agents and representatives of said Defendants, who knowingly and willfully participated in such illegal action are guilty of outrageous conduct."

A "Second Amended Complaint" was filed October 29, 1976, wherein the plaintiffs averred: "the failure to pay for said taking resulting therefrom is an improper and illegal use of eminent domain which in effect has illegally frozen the zoning for the past several years in contemplation of alleged future need for said property, around the year 1995."

On July 10, 1979, the following "Agreed Order" was entered in the above litigation: "It appearing to the Court, as evidenced by the signatures of counsel below, that this cause should be dismissed with prejudice, It is, therefore, ORDERED that this cause is dismissed with prejudice. The costs shall be assessed against the Defendant Metropolitan Government."

Plaintiffs assert here that they have been deprived of property without due process of law in violation of the Fifth and Fourteenth Amendments to the United States Constitution. Plaintiffs availed themselves of at least one "process" by filing the inverse condemnation action in 1976 under then Tenn.Code Ann. §§ 23–1423, 1424, now 29–16–123 and 124. Plaintiffs say in this Court that this was an inadequate remedy since they were limited in their proof of damages to the fair market value of the land and were not able to prove its "highest and best use," i.e., commercial, because of the rules obtaining under Tennessee law. The same complaint is registered as to the subsequent eminent domain proceedings initiated by the State wherein they were awarded compensation of $10,500 per acre.

[1] However, accepting for the purpose of argument this assertion of plaintiffs with regard to their state litigation, and laying aside for the moment the res judicata assertion of defendants as to the "Agreed Order" of dismissal with prejudice recounted above, the State of Tennessee provided "due process" to plaintiffs to address the allegedly arbitrary actions of defendants. Tenn.Code Ann. § 27–9–101, et seq., provided a method of review by certiorari of any alleged arbitrary action of the defendants. In *Brooks v. City of Memphis*, 192 Tenn. 371, 241 S.W.2d 432 (1951), the court expressly recognized the availability of this remedy to review arbitrary and confiscatory zoning actions of cities.

The alleged wrongful conduct of the defendants began in 1974 and was evidenced by Council votes, councilmanic debate, and mayoral veto in 1975. It was alleged in detail in the 1976 pleadings of plaintiffs in state court. These dates are significant in consideration of the Statute of Limitations defense, but relevant to this discussion as to whether there was a waiver or deliberate bypass of available state process.

This Court is aware of those decisions which hold that the existence of a state remedy does not preclude federal court consideration where a constitutional violation is alleged.[1] A fourteenth amendment claim, however, alleging a taking of property "without due process of law" requires analysis beyond this flat, and perhaps overly-expansive, assertion of constitutional cognizance.

---

1. *Home Telephone & Telegraph Co. v. City of Los Angeles*, 227 U.S. 278, 33 S.Ct. 312, 57 L.Ed. 510 (1913); *see also, Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961).

■ "Without due process of law" requires an inquiry into whether the state, in depriving plaintiff of property *provided* "process" and whether that process was "due." If state process is available and it is adequate to provide a fair hearing and opportunity for redress of grievance, that is, "due," how can the state be said to have deprived the citizens of property "without due process of law?" I believe it cannot. If the citizen elects to bypass the due process provided and comes to federal court with a fourteenth amendment claim, is a cause of action stated? I believe not.

■ Several of the considerations supporting defendants' motion to dismiss for failure to state a claim upon which relief can be granted also lend support to the separate ground that this Court lacks subject matter jurisdiction. It has long been established that federal courts will exercise jurisdiction where a zoning ordinance acts to deprive an individual of his constitutionally protected rights. *See, e.g., Euclid v. Amber Realty Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926) (zoning cannot be "clearly arbitrary and unreasonable, having no relation to the public health, safety, morals or general welfare"); *Schad v. Mt. Ephraim,* 452 U.S. 61, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981) (federal courts will not permit municipalities to use zoning as tool to abridge First Amendment rights).

■ However, it is equally clear that as a general rule, federal courts regard an attack on the validity of zoning as a dispute to be resolved in state court. *City of Eastlake v. Forest City Enterprises, Inc.,* 426 U.S. 668, 677, 96 S.Ct. 2358, 2364, 49 L.Ed.2d 132, 139 (1976); *Studen v. Beebe,* 588 F.2d 560, 565 (6th Cir. 1978). In *Eastlake,* the property owner challenged a statutory scheme which let certain zoning matters be voted on by referendum. There, the Court stated:

> If respondent considers the referendum result itself to be unreasonable, the zoning restriction is open to challenge in

state court, where the scope of the state remedy available to respondent would be determined as a matter of state law, as well as under Fourteenth Amendment standards. That being so, nothing more is required by the Constitution.

*Id.*

In *Studen v. Beebe, supra,* the Sixth Circuit stated flatly that litigants protesting a zoning decision could not create federal jurisdiction by filing an insubstantial action under the civil rights statute. *Studen,* 588 F.2d at 566; *see also Burnett v. McNabb,* 565 F.2d 398 (6th Cir. 1977). The plaintiffs in *Studen* filed a complaint under 42 U.S.C. §§ 1983 and 1985 alleging that city officials conspired to deprive them of equal protection of the laws and deny them due process. In essence, the property owners protested a decision by city officials to downgrade the zoning of plaintiffs' property from a three tiered zoning plan providing for residential, commercial and industrial use to single family residential use. The Sixth Circuit agreed with the district court that "this zoning dispute is a matter within the jurisdiction of the State courts of Ohio." 588 F.2d at 566 (1978).

■■ The same holds true here where plaintiffs seek to invoke federal jurisdiction for their complaint, a matter which is properly in the State courts of Tennessee.[2] As in *Studen,* this is "yet another effort to make a federal case out of litigation which belongs in the state courts." 588 F.2d at 562. Furthermore, the assertion by plaintiffs that government officials "conspired" or acted knowingly to prevent the value of the property from appreciating does not give rise to federal jurisdiction. The court in *Studen* answered a claim that the defendants down-graded the zoning for plaintiffs' property, fully aware that plaintiffs could not feasibly use their property for single-family dwellings, saying that

> ... it appears to the Court that such considerations go to the question of

2. For purposes of this discussion, there is no appreciable distinction between a "deprivation" in a section 1983 complaint and a "tak-

ing" in this action based on the Fifth and Fourteenth Amendments.

whether the zoning is constitutionally impermissible under the standards of *Euclid v. Ambler Realty Co.,* 272 U.S. 365, 395 [47 S.Ct. 114, 121, 71 L.Ed. 303] (1926) as being "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare."

*Id.* at 565. Citing *Eastlake,* the Court then stated the generally accepted view that questions such as this are preferably resolved in state court. *Id.*

Plaintiffs rely heavily in their brief on the case of *Foster v. City of Detroit,* 405 F.2d 138 (6th Cir. 1968). The case is clearly distinguishable. In *Foster,* at the time the suit was filed, Michigan law was "lacking in desirable clarity" as to whether plaintiffs there had a remedy for providing "just compensation." The Detroit authorities had allowed a condemnation suit to pend for 10 years during which the value of the property seriously deteriorated. The rule of law applied to plaintiffs was the deteriorated fair market value at the taking, rather than at the beginning of the suit.

Here, the question is whether the speculating plaintiffs should have been allowed to have their land rezoned and reclassified in 1974 so that in 1980 the jury could have considered the land value at its potential commercial use.

In *Foster,* the court ruled that plaintiffs there could bring their complaint against the city for violation of the Fifth and Fourteenth Amendments in federal court. However, at least one later Sixth Circuit opinion stressed that *Foster* does not stand for the proposition that a federal court *must* exercise jurisdiction in a case of this nature. *Muskegon Theatres, Inc. v. City of Muskegon,* 507 F.2d 199, 205 (6th Cir. 1974). There, the court quoted language used in the original *Foster* case emphasizing the fact that at the time of plaintiff's inverse condemnation complaint in *Foster:*

Michigan had not by statute or clear decisional announcement provided a remedy whereby to compensate property owners for damages consequent upon the long pendency of an ultimately-discontinued condemnation proceeding.

*Id.* at 205, quoting *Foster,* 405 F.2d at 141.

In *Muskegon Theatres,* the court held that the district court had the power to refrain from exercising jurisdiction under the abstention doctrine. *Muskegon Theatres,* 507 F.2d at 200.[3]

Plaintiffs assert that this language in *Foster* gives credence to their attack on the statutory scheme in Tennessee as inadequate because it failed to allow them to recover a potential profit as speculators. Plaintiffs analogize *Foster* to this case where, they claim, they did not have the luxury of an appropriate state remedy. On this question, plaintiffs' views are erroneous. *Foster* is inapposite here for two reasons. First, the court in *Foster* was obviously seeking to redress a potentially abusive power of eminent domain by which the City could drive down the price of property and then pay a greatly reduced price. Here, on the other hand, plaintiffs are land speculators seeking to have this Court protect their business from all risks and guarantee the highest possible profit in their venture.[4] Secondly, under Tennessee law, these plaintiffs had more than one opportunity to raise these issues in state court. In fact, many of these issues were raised by plaintiffs in the inverse condemnation case which they dismissed with prejudice. Furthermore, plaintiffs had a full and fair hearing in the eminent domain proceeding where they could have asserted these claims. These considerations, plus the recent trend in the cases discouraging the use of federal courts as an appellate mecha-

---

**3.** Abstention is but one of the many troublesome issues pertaining to federal-state relations raised by this case. Abstention appears to be inappropriate here because, inter alia, the parties have already availed themselves of state court jurisdiction.

**4.** It is worth repeating that plaintiffs received $10,500 per acre, representing $4,500 more per acre than they paid for the land in 1970, or an appreciation of 75 percent over seven years. Moreover, there is no compelling evidence that defendants here drove down the value of the land through dilatory tactics.

nism for local zoning decisions, support the conclusion that this Court lacks subject matter jurisdiction.

■ A distinct and independent factor also militates in favor of defendants' motion to dismiss. Plaintiffs have failed to state a claim upon which relief can be granted. The most compelling reason to dismiss on this ground is that there was no taking. The theory upon which plaintiffs proceed is that the defendants took away a property interest without due process of law by refusing to upzone the purchased land. Courts generally are less sympathetic to this type of complaint, as opposed to a case where existing property rights are diminished. This much was clearly recognized by the Supreme Court in *Eastlake:*

> The situation presented in this case is not one of a zoning action denigrating the use or depreciating the value of land; instead, it involves an effort to *change* a reasonable zoning restriction. No existing rights are being impaired; new use rights are being sought from the City Council. Thus, this case involves an owner's seeking approval of a new use free from restrictions attached to the land when it was acquired.

426 U.S. at 679, 96 S.Ct. at 2364, 49 L.Ed.2d at 141 (1976) (emphasis in original).

■ Even where existing values are adversely affected, before a court will intercede against the municipal power to zone and control land use, the property owners must prove that the zoning is not rationally related to a legitimate state interest and that it deprives them of economically viable use of the property. *Schad v. Mt. Ephraim,* 452 U.S. 61, 68, 101 S.Ct. 2176, 2182, 68 L.Ed.2d 671, 680 (1981). *See also, Agins v. City of Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106, 112 (1980); *Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 138 n.36, 98 S.Ct. 2646, 2666 n.36, 57 L.Ed.2d 631 (1978). Only where these two tests are met does the application of a general zoning law to particular property effect a taking. *Agins v. City of Tiburon, supra.*

■ The actions taken by defendants clearly pass the mere rationality test. Thus, the only question is whether plaintiffs have been denied economically viable use of their property. Plaintiffs here face a most difficult burden, especially since any action or the lack thereof by defendants in not upzoning the property merely left the property in its existing state. Underlying plaintiffs' complaint appears to be the belief that property owners have a constitutional right, at least vis-a-vis the government, to achieve the most beneficial economic use of their property. This belief is incompatible with, and squarely contradicts, the rationale behind the power of a municipality to zone and otherwise control land use.

The flaw in plaintiffs' complaint is highlighted by the reasoning used in *Penn Central Transportation Co. v. New York City, supra.* There Penn Central complained that through the application of a local zoning ordinance which placed a premium on preserving historic structures, New York City had effected a taking by prohibiting Penn Central from constructing a skyscraper office building in the space above Grand Central Station, a "landmark" as defined by the ordinance. Plaintiffs complained that the landmark preservation ordinance had "taken" private property in violation of the Fifth and Fourteenth Amendments. In ruling that there was no taking, the Supreme Court relied in part on analysis which is dispositive for our purposes:

> ... the submission that appellants may establish a "taking" simply by showing that they have been denied the ability to exploit a property interest that they heretofore had believed was available for development is quite simply untenable.

438 U.S. at 130, 98 S.Ct. at 2662, 57 L.Ed.2d at 652 (1978).

The Court also reiterated that courts had uniformly rejected the notion that diminution in property value, standing alone, can establish a "taking." *Id.; see also Euclid v. Ambler Realty Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926); *Ortega Cabrera v. Municipality of Bayamon,* 562 F.2d 91 (1st Cir. 1977).

In a recent opinion, the Eleventh Circuit disposed of a complaint alleging that a rezoning decision effected a "taking" by reducing the fair market value of property from $285,000 to $135,000. *Nasser v. City of Homewood,* 671 F.2d 432 (11th Cir. 1982). In denying plaintiffs' due process complaint, the court stated:

> Neither deprivation of the most beneficial use of the land, *United States v. Central Eureka Mining Co.,* 357 U.S. 155, 168, 78 S.Ct. 1097, 1104, 2 L.Ed.2d 1228, 1236 (1958); *Hadacheck v. Sebastian,* 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915), nor a severe decrease in the value of property; *Goldblatt v. Hempstead,* 369 U.S. 590, 594, 82 S.Ct. 987, 990, 8 L.Ed.2d 130, 133–34 (1962); *Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926), measures up to an unlawful taking. "Government could hardly go on if, to some extent, values incident to property could not be diminished without paying for every such change in the general law." *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 413, 43 S.Ct. 158, 159, 67 L.Ed. 322, 325 (1922). The district court correctly disposed of the just compensation claim on the motion for summary judgment. *See generally Agins v. City of Tiburon,* 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980); *Penn Central Transp. Co. v. City of New York,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978).

*Id.* at 438. This brief discussion answers most of this complaint in a nutshell.

Because plaintiffs have not been deprived of economically viable use of their land due to acts by the defendant, there has been no "taking." Consequently, plaintiffs have failed to state a claim upon which relief can be granted. ⸌

██ Finally, a third reason exists for dismissing plaintiffs' complaint. This action is barred by res judicata. Whether or not the dismissal of the inverse condemnation case brought by these plaintiffs in state court suffices for purposes of res judicata is a debatable question. *Compare England v. Automatic Canteen Co.,* 349 F.2d 988 (6th Cir. 1965), *cert. denied,* 383 U.S. 925, 86 S.Ct. 928, 15 L.Ed.2d 845 (dismissal with prejudice constitutes an adjudication of the merits as fully as if the order had been entered after trial); *with Cream Top Creamery v. Dean Milk Co.,* 383 F.2d 358 (6th Cir. 1967) (no res judicata effect given dismissal with prejudice where judgment unaccompanied by findings of fact or decision on merits as to complaint alleging continuing wrongful acts subsequent to dismissal). It is not necessary to decide which of these two precedents governs the case at bar because the state court in the subsequent eminent domain proceeding was the forum in which plaintiffs should have pursued these issues. As already discussed in some detail, state court is a proper forum for plaintiffs' Fifth and Fourteenth Amendments claim. *City of Eastlake v. Forest City Enterprises, supra; Studen v. Beebe, supra.* Res judicata prevents litigation of these issues since these grounds were available to plaintiffs in the state proceeding, even though they may not have been asserted. *Brown v. Felsen,* 442 U.S. 127, 131, 99 S.Ct. 2205, 2209, 60 L.Ed.2d 767, 771 (1979); *Chicot County Drainage Dist. v. Baxter State Bank,* 308 U.S. 371, 378, 60 S.Ct. 317, 320, 84 L.Ed. 329 (1940).

Had plaintiffs been so inclined, they could have raised their federal constitutional claims in state court. Plaintiffs could have challenged Tennessee's rule against letting the jury base its verdict solely on what the property would be worth had it been zoned for commercial or industrial use.[5] Had the issue been raised and decided adversely to plaintiffs, they could have appealed through the state judicial system and eventually sought review by the United States Supreme Court.[6] The concepts of judicial

---

5. Of course, this Court has already expressed its skepticism about plaintiffs' likelihood of success on this theory.

6. Again, it is noteworthy that the defendants—not the plaintiffs—filed an appeal protesting the amount of the verdict.

economy, protecting the integrity of judgments entered by courts of competent jurisdiction, and fairness to the litigants, all embodied by the doctrine of res judicata, militate against permitting plaintiffs to bring this action in federal court. Thus, res judicata provides a third ground upon which plaintiffs' complaint can be dismissed.

### Conclusion

As stated above, plaintiffs' complaint is dismissed for three reasons: lack of subject matter jurisdiction, failure to state a claim upon which relief can be granted, and res judicata.[7] This opinion, however, cannot be read to give municipal authorities carte blanche to use the power of zoning to deny individuals of their constitutional rights. The standards espoused in *Euclid v. Ambler Realty Co., supra,* still apply to protect individual litigants against clearly arbitrary and abusive acts. This simply is not such a case.

---

**7.** Having addressed these grounds, the Court does not reach the other defenses asserted by defendants.