**754 ORANGE AVE., INC., Appellee,**

v.

**CITY OF WEST HAVEN, CONNECTICUT, Daniel Krevolin, individually and as Zoning Enforcement Officer for the City of West Haven; Steven Di Pier, individually and as Building Official for the City of West Haven; Michael N. D'Errico, individually and as Chief of Police of the City of West Haven; Lawrence Minichino, individually and as Mayor of the City of West Haven, Appellants.**

**No. 855, Docket 84–7893.**

United States Court of Appeals, Second Circuit.

Argued Feb. 25, 1985.

Decided April 30, 1985.

Jonathan Einhorn, Corp. Counsel, City of West Haven, Conn. (Timothy Pothin, Law Clerk, City of West Haven, Conn., on the brief), for appellants.

Daniel A. Silver, New Britain, Conn. (Alvin Pudlin, Pudlin & Silver, New Britain, Conn., on the brief), for appellee.

Before OAKES, MESKILL, and PIERCE, Circuit Judges.

OAKES, Circuit Judge:

This case comes to us in a somewhat confused posture. The parties' briefs refer to zoning ordinances, to a licensing and permit ordinance, and to a building permit, all of which bear on the proposed operation of an "adult bookstore" that would offer "sexually explicit books and magazines" and include coin-operated viewing machines exhibiting "sexually explicit films." Appeal is by the City of West Haven, Connecticut ("the City"), from the grant of a preliminary injunction by the United States District Court for the District of Connecticut, T.F. Gilroy Daly, Chief Judge, enjoining the City from enforcing its zoning and licensing ordinances against appellee 754 Orange Avenue, Inc. ("754 Orange"), and ordering the City to issue a building permit to 754 Orange as had been previously ordered by the district court. Since the case was briefed, however, the City has complied with the building permit portion of the injunction, and that issue is therefore moot. Although the zoning and licensing issues are not moot, the City conceded on oral argument, as it had not in its brief, that the City's prohibition on coin-operated viewing machines in retail stores is invalid. For the parties' guidance, however, we will treat the zoning and licensing ordinances as if such a concession had not been made, since the controversy as to the location of an "adult bookstore"—a term the ordinance does not define—is a live and viable one. We affirm the grant of the preliminary injunction.

FACTS

754 Orange leases premises that the district court located at 760–762 Orange Avenue, West Haven, Connecticut, but that the parties stipulated to be located at 761 Orange Avenue. At these premises, 754 Orange intends to operate an adult bookstore that would offer, in addition to books and magazines, films that are accessible to its customers through individual coin-operated viewing booths. The parties stipulated that the books and magazines, as well as the films, portray "sexually explicit" activi-

ty. Precisely what "sexually explicit" means is, so far as the record discloses, left to the reader's as well as to the court's imagination.

On February 24, 1984, 754 Orange applied to the City for a building permit, apparently to make renovations necessary to conduct the business of the bookstore, and presumably pursuant to a building ordinance that the parties have not seen fit to include in our record. Although we assume that the sale of books and magazines was a permitted use under the City's then-existing zoning ordinances and therefore posed no bar to the issuance of a building permit, the City's zoning ordinances did contain a section that arguably imposed restrictions, if not a prohibition, on 754 Orange's contemplated use of its leased premises. Entitled "Use Group 10," section 32–2.7 of the City's 1967 zoning regulations, as amended effective May 1, 1982, identifies a category, Use Group 10, which "consists of all indoor or outdoor recreation centers, and amusement, athletic and entertainment facilities." Under section 32–2.7, uses falling within Use Group 10 are prohibited in "residential areas or local commercial districts ... due to the traffic and noise that they generate" and allowed only by Special Permit in other zoning districts. A special permit is to be granted by the Planning and Zoning Commission subject to five enumerated considerations—"location on the street system and impact on traffic patterns," "type of structure located in," "off street parking," "distance to schools, parks and playgrounds," and "method of operation." In addition to the foregoing considerations, section 32–2.7 authorizes the Planning and Zoning Commission to "set any restrictions it deems necessary to insure the health, safety and welfare of the general public including screening, security, personnel, minimum floor space and hours of operation," and to recommend the revocation of a Special Permit on a finding "that the permitted use is generating ex-

cessive noise, loitering, littering or traffic hazards." Section 32–2.7 also contains a list of uses that are "among those included in Use Group 10"—a list that, when 754 Orange applied for its building permit, contained the entry "Amusement Centers." Finally, section 32–2.7 grants the Director of Planning discretionary authority to permit temporary fairs or carnivals operated as fund raising activities and to permit:

A maximum of four (4) coin operated amusement machines or game tables ... in any sitdown eating or drinking facility, recreation or social club or amusement facility as an accessory use if the applicant can demonstrate that these machines or tables are clearly incidental to the primary business, and that they will be operated and maintained in such a manner so as to prevent excessive noise, loitering, littering or traffic hazards.

The Planning Director's discretion is limited, however, in that "[n]o coin operated amusement machines or game tables shall be permitted in any retail store, wholesale establishment, office or manufacturing facility."

The extent to which section 32–2.7 of the City's zoning ordinances in its then-current state was applicable to the use contemplated by 754 Orange for its leased premises is unclear. The installation of coin-operated viewing booths in a bookstore might arguably convert a bookstore into an "amusement center" and therefore make applicable the Special Permit provision of section 32–2.7, conditioning the use of the leased premises on approval of the City's Planning and Zoning Commission after submission of information about the operation of the business.[1] It is also unclear but arguable that 754 Orange's coin-operated viewing machines are "coin-operated amusement machines" within the meaning of section 32–2.7, thereby engaging either the four machine maximum imposed upon "clearly incidental" uses of such machines,

1. Under section 32–2.7, the Planning and Zoning Commission is to consider a Special Permit applicant's method of operation on the basis of "[i]nformation concerning business hours, standards of conduct, personal security, maintenance, site plan and floor plan for the premise [that] shall be submitted to the Planning and Zoning Commission."

or the flat ban against them in retail stores. Perfectly clear, in contrast, is the inapplicability of the "distance to schools, parks and playgrounds" provision of the then-current section 32–2.7, which states that "[n]o commercial recreational facility shall be located on a property within a one-thousand (1000) foot radius of a park, playground or public or private primary or secondary school," since 754 Orange's leased premises are between 1,000 and 1,500 feet from May V. Carrigan Middle School, the nearest school, park, or playground.

As if the City's zoning ordinance were insufficient to confuse the status of the use contemplated by 754 Orange for its leased premises, the City also has a licensing and permit ordinance that raises similar issues of applicability while authorizing a different mode of enforcement. Adopted on September 27, 1982, section I of this ordinance establishes, inter alia, a license requirement for "mechanical amusement device[s] (including video games)." The licensing and permit ordinance also provides, at section II, that "the [p]olice [d]epartment ... shall in its reasonable discretion and subject to its approval issue the above stated licenses and permits and shall provide suitable forms and blanks and applications and shall keep suitable records of all licenses and permits and applications." Furthermore, under its provisions, the police department may "revoke a license or permit for any breach of the terms and conditions thereof, upon giving to the person to whom the same is issued notice of such revocation, and making a record thereof." There is no provision for appealing to any court a denial of a license or permit application or a revocation of a license or permit; instead, appeal must be made within ten days to the City Council.

None of the foregoing issues concerning the applicability and enforcement of the City's zoning and licensing ordinances were addressed, much less resolved, when 754 Orange applied to the City for a building permit. Instead, the City's Building Official, defendant Steven Di Pier, simply refused to issue the building permit. In re-

sponse, on April 23, 1984, 754 Orange filed this action in the district court under 42 U.S.C. § 1983 (1982) for injunctive relief and a declaratory judgment against the City and against Daniel Krevolin, Steven Di Pier, Michael N. D'Errico, and Lawrence Minichino, who were the City's Zoning Enforcement Officer, Building Official, Chief of Police, and Mayor, respectively. An order to show cause issued, and on May 4, 1984, the district court ordered that the City's Building Official issue a building permit no later than May 7, 1984. The permit did not issue, a motion for contempt was filed, and on May 14 a hearing was held on the contempt. On May 23, following the filing of an amended complaint on May 15 and a stipulation of facts by the parties, the district court issued the following order:

> Based on the pleadings and representation of counsel in this matter, it is hereby ordered that the defendant Steven Di Pier as building official for the City of West Haven and/or his successors or whomever is empowered either on a permanent or temporary basis to issue building permits on behalf of the City of West Haven, Connecticut, to [sic] issue a building permit for the plaintiff's leased premises known as 760–762 Orange Avenue, West Haven, Connecticut.
>
> Counsel for the plaintiff is to be notified immediately by counsel for defendants upon appointment of any person who becomes authorized to issue building permits in the City of West Haven.

In another order issued the same day, the district court ordered that defendant Lawrence Minichino, the City's Mayor, in no way impede or obstruct the issuance of a building permit to the plaintiff. The Mayor responded by removing the defendant Steven Di Pier from the position of Building Official on May 31, 1984, while declining himself to issue any building permit.

On June 15, 1984, the City amended section 32–2.7 of its zoning ordinances, increasing the minimum distance required between a "commercial recreational facility" and a school, park or playground from

1,000 feet to 1,500 feet and adding "Adult Bookstores" to the list of uses falling within Use Group 10. As a result, to the extent that the use contemplated for 754 Orange's leased premises constituted a "commercial recreational facility," those premises were no longer in compliance with section 32–2.7. Furthermore, under the newly amended section 32–2.7, 754 Orange's proposed "adult bookstore" would clearly be required to obtain a Special Permit from the Planning and Zoning Commission, and to conform to the Special Permit Requirements referred to earlier, as well as to any further restrictions set forth by the Planning and Zoning Commission.

On the basis of the newly amended section 32–2.7, the City moved for dismissal of 754 Orange's complaint. The district court referred the City's motion to dismiss and 754 Orange's cross-application for a preliminary injunction to Thomas P. Smith, United States Magistrate, who issued a sixteen-page recommended ruling on September 26, 1984, in favor of 754 Orange's claim for injunctive relief.

After citing this circuit's requirements for obtaining a preliminary injunction, see *Jackson Dairy, Inc. v. H.P. Hood & Sons,* 596 F.2d 70, 72 (2d Cir.1979),[2] the Magistrate first addressed plaintiff's showing of irreparable harm, finding that even if "coin operated amusement machines" were "artificially interpreted" not to include film-viewing devices, irreparable harm would still follow from the denial of a preliminary injunction, since the application of a term as "undefined, ambiguous and sweeping" as is "commercial recreational facilities" within section 32–2.7 would impermissibly vest in the Chief of Police an "unfettered freedom to characterize any use listed in 'Use Group 10' [citation omitted] as being

subject to the radius requirement [of section 32–2.7], should he choose to do so."[3]

The Magistrate went on to find that 754 Orange had demonstrated a likelihood of success on the merits. He found no evidence that a legally significant governmental interest was presented to or considered by the Planning and Zoning Commission when it increased the radius requirement under section 32–2.7 to encompass 754 Orange's leased premises. The Magistrate reasoned that because the zoning ordinance created more than merely "incidental" limitations on First Amendment activity, it was justifiable only if "the governmental interest [was] unrelated to the suppression of free expression," *United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968). He found, however, that the evidence before him "strongly suggests the zoning resolutions were amended in order to frustrate plaintiff's sale and display of sexually explicit material." Alternatively, the Magistrate found that 754 Orange had shown a likelihood of success on the merits, in that, taken together, section 32–2.7 of the zoning ordinance and section II of the licensing ordinance are impermissibly vague and overbroad within the meaning of *Shuttlesworth v. Birmingham,* 394 U.S. 147, 150–51, 89 S.Ct. 935, 938–39, 22 L.Ed.2d 162 (1969).

Addressing also the second prong of the *Jackson Dairy* test, the Magistrate found that 754 Orange had sustained its burden of showing not only sufficiently serious questions going to the merits to make them a fair ground for litigation but also a balance of hardships tipping decidedly towards plaintiff. In this connection, the Magistrate found that "a serious due process question" was raised where, as here, an application for a permit was made, a

---

**2.** Under the standard for injunctive relief set forth in *Jackson Dairy,* 596 F.2d at 72, a plaintiff must show:
(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decided toward the party requesting the preliminary relief.

**3.** The Magistrate apparently thought that the Chief of Police could deny a license under the City's licensing ordinance by virtue of his construction of the City's zoning ordinance—a construction which, however, would seem in the first instance to be for the Planning and Zoning Commission.

court order to grant that permit had issued, and a recalcitrant city then relied on an ordinance amended thereafter as justification for denying the permit. Finally, the Magistrate noted that there had been no affirmative showing that the City would be irreparably harmed by the grant of a preliminary injunction.

Adopting the Magistrate's recommendations in full, Chief Judge Daly granted a preliminary injunction as above stated by an order dated October 15, 1984.

### DISCUSSION

1. *The "Adult Bookstore" Issue.* The arguments as set forth in the briefs are like ships passing in the night, never seeming to have contact with each other. One may gather, however, that the City's claim is that 754 Orange did not show that enforcement of the zoning regulations would cause it irreparable harm because, as in *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976), the operation of adult bookstores is not eliminated but simply restricted as to location in order to preserve the quality of urban life and, as the City claims here, to protect children from distractions disturbing to an educational environment. The City argues further that the irreparable harm alleged by 754 Orange, the deprivation of a fundamental right, cannot be shown here because prurient or erotic expression does not further the core purposes of the First Amendment. *Cf. FCC v. Pacifica Foundation,* 438 U.S. 726, 746, 98 S.Ct. 3026, 3038, 57 L.Ed.2d 1073 (1978)

(plurality opinion) (sexual or excretory language occupies inferior position in hierarchy of First Amendment values).

 To anyone who would contemplate establishing a bookstore business within the City's jurisdiction, the City's threat to enforce its zoning and licensing ordinances against 754 Orange operates as a prior restraint. *See Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 552–58, 95 S.Ct. 1239, 1243–46, 43 L.Ed.2d 448 (1975); *Shuttlesworth,* 394 U.S. at 150–51, 89 S.Ct. at 938–39. We say this, because absent a definition of "adult bookstore" that would confine the application of section 32–2.7 to a store purveying or making a business of purveying "sexually explicit" literature as explicitly defined, for example, in the Detroit ordinance under consideration in *American Mini Theatres,* 427 U.S. at 53 n. 4, 96 S.Ct. at 2444 n. 4, the City's zoning and licensing restrictions may, in the hands of its administrators, sweep into its scope literature that has always been accorded full First Amendment protection. *Cf. Carlin Communications, Inc. v. FCC,* 749 F.2d 113, 119 (2d Cir.1984) (regulation of indecent material must be carefully limited because of inherent dangers in regulating any form of expression).

 Moreover, while it may be permissible for a city to regulate the time, place, and manner of operation of a bookstore, it cannot do so indiscriminately;[4] as the Supreme Court stated in *Schad v. Borough of Mount Ephraim,* 452 U.S. 61, 75–76, 101

---

**4.** It is not at all clear, even after *American Mini Theatres,* that time, place, and manner analysis is appropriately applied to the instant circumstances. Time, place, and manner restrictions are permissible only where the restrictions are content-neutral. *See, e.g., Heffron v. International Society for Krishna Consciousness, Inc.,* 452 U.S. 640, 647–48, 101 S.Ct. 2559, 2563–64, 69 L.Ed.2d 298 (1981); *Virginia State Board of Pharmacy v. Virginia Citizens Consumers Council,* 425 U.S. 748, 771, 96 S.Ct. 1817, 1831, 48 L.Ed.2d 346 (1976); *Carlin Communications,* 749 F.2d at 120–21. Although Justice Stevens seems to have indicated in *American Mini Theatres,* 472 U.S. at 71–72, 96 S.Ct. at 2452–2453, that the Detroit ordinance at issue was being

upheld as a reasonable time, place, and manner restriction, such a view commanded only a plurality of the Court, and was flatly rejected by Justice Powell in his concurring opinion, *id.* at 82 n. 6, as well as by four dissenting Justices, *id.* at 84, 96 S.Ct. at 2459. Moreover, since *American Mini Theatres,* the Court has reaffirmed the requirement that any time, place, and manner restrictions be content-neutral, *see, e.g., Heffron, supra.* Our examination of the City's zoning ordinance under a time, place, and manner analysis should therefore be interpreted to assume arguendo the appropriateness of such an analysis, reflecting the influence of the plurality position in *American Mini Theatres.*

S.Ct. 2176, 2186–87, 68 L.Ed.2d 671 (1981), "[t]o be reasonable, time, place and manner restrictions not only must serve significant state interests but also must leave open adequate alternative channels of communication."

■ The record before us, however, fails to justify section 32–2.7 as a reasonable time, place, and manner restriction by reference either to the presence of a significant state interest or to the existence of adequate alternative channels of communication.[5] We find no evidence whatsoever that would relate the impact—upon traffic patterns, current noise levels, or parking places—of "adult bookstores," however precisely defined, to the promotion of the City's interest in reducing neighborhood decline or danger to children.[6] Furthermore, on the record before us, it is impossible to determine whether or not section 32–2.7 leaves open adequate alternative channels of communication; we have no idea as to what portions of the City of West Haven, if any, remain available for the operation of "adult bookstores" under the newly amended section 32–2.7. *Cf. American Mini Theaters,* 427 U.S. at 71 n. 35, 96 S.Ct. at 2453 n. 35 (plurality) (no suppression of lawful speech where a myriad of permissible locations remains despite zoning restriction). As stated in *Fantasy Book Shop,*

*Inc. v. City of Boston,* 652 F.2d 1115, 1120 (1st Cir.1981),

[r]egulations governing in advance the time, place or manner of expression permitted in a particular public forum are valid if they serve important state interests by the least restrictive means possible. [Citations omitted.] Put another way, a regulation that is directed primarily at conduct or at noncommunicative aspects of protected expressive activities is permissible despite an incidental prior burden on expression if it is justified by sufficiently strong permissible government interests.

■ As the matter was put in *O'Brien,* 391 U.S. at 377, 88 S.Ct. at 1679, the state's interest in regulating nonspeech conduct may sometimes justify incidental limitations on protected speech, but only if:

[1] it is within the constitutional power of the Government; [2] if it furthers an important or substantial governmental interest; [3] if the governmental interest is unrelated to the suppression of free expression; and [4] if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*See also* L. Tribe, *American Constitutional Law* 580–82, 682–84 (1978) (analyzing indirect abridgement of free flow of infor-

---

**5.** To the extent that the applicability of section 32–2.7 to 754 Orange's contemplated use would trigger the enforcement of section II of the City's licensing and permit ordinance, our discussion of section 32–2.7 pertains equally to section II as applied.

**6.** In this sense, the comparison that the City attempts to draw between the circumstances in *American Mini Theatres* and those here is inapt. In *American Mini Theatres,* 427 U.S. at 54–55 & n. 8, 96 S.Ct. at 2444–45, & n. 8, the City of Detroit expanded the scope of its "Anti-Skid Row Ordinance" in 1972 to include adult theaters and adult bookstores only after the number of adult theaters in Detroit grew from 2 to 25 within the previous 5 years, with "a comparable increase in the number of adult bookstores and other 'adult-type businesses.'" *American Mini Theatres.* Moreover, Detroit's decision to amend its zoning ordinance was based at least in part on the determination of urban planners and real estate agents that:

the location of several such businesses in the same neighborhood tends to attract an undesirable quantity and quality of transients, adversely affects property values, causes an increase in crime, especially prostitution, and encourages residents and businesses to move elsewhere.

*Id.* at 55, 96 S.Ct. at 2445. In contrast, the City stated during oral argument that the adult bookstore contemplated by 754 Orange would be the first and therefore only such store in West Haven. Moreover, the record is devoid of evidence that the City sought or obtained a professional analysis of the extent to which 754 Orange's proposed adult bookstore, given the City's then-current zoning ordinances would affect the quality of urban life or the educational environment for children. It is apparent that while Detroit's amendment of its zoning ordinance was supported by professional analysis of a concrete situation, the City's amendment of section 32–2.7 appears to have been both undeliberated and speculative.

mation or ideas). In contrast to the City of Boston's satisfaction of the *O'Brien* test in *Fantasy Book Shop*, 652 F.2d at 1121, the City of West Haven does not meet the *O'Brien* test because the newly amended section 32–2.7 as drawn and as enacted appears to reflect a governmental desire to suppress free expression. Section 32–2.7 is impermissible as drawn, because it ignores the fact that what is "prurient" or "erotic" to one person may be mere realism or sheer art to another; the City's virtually total failure to recognize, much less discharge, its responsibility to protect freedom of expression against whatever legitimate but competing concerns it may have had, as that failure is reflected in a zoning ordinance that restricts without even defining the operation of "adult bookstores," evinces an intent that cannot be said to be "unrelated to the suppression of free expression" under the *O'Brien* test.

 In addition, section 32–2.7 is impermissible as enacted, because its adoption strongly suggests that it was aimed solely at 754 Orange. Only after the City learned that 754 Orange's leased premises is beyond 1,000 feet from any school, park or playground did the City amend the ordinance so as to include 754 Orange's building within its scope. It is true that, as a matter of general zoning law in Connecticut, a permit applicant does not have a vested right in the existing classification of his land; instead, his right to establish a particular use may be summarily terminated by an amendment that reclassifies his land and outlaws the use in question. *See Edward Balf Co. v. Town of East Granby*, 152 Conn. 319, 323, 207 A.2d 58, 60 (1965); 1 R. Anderson, *American Law of Zoning* § 6.20, at 399 (2d ed. 1976). Even as a matter of zoning law, however, a court will not allow changed building zone regulations to act as a bar to a building project where it would be inequitable to do so. *Marmah, Inc. v. Town of Greenwich*, 176 Conn. 116, 123, 405 A.2d 63, 67 (1978). That the equity of notice, if not its right, may be a legitimate consideration in First Amendment cases appears clear from Justice Powell's key, concurring opinion in *American Mini Theatres*, 427 U.S. at 80, 96 S.Ct. at 2457 (emphasis added), where he justified the ordinance at issue in part by the fact that it *"was already in existence, and its purposes clearly set out,* for a full decade before adult establishments were brought under it." Thus, in *Avalon Cinema Corp. v. Thompson*, 667 F.2d 659, 662–63 (8th Cir.1981), a case in which a zoning ordinance restricting the showing of sexually explicit films was struck down, the Eighth Circuit, sitting en banc, relied heavily on the fact that the ordinance was enacted after the city council was informed of the impending opening of an adult theater. So, too, it has been noted in *Purple Onion, Inc. v. Jackson*, 511 F.Supp. 1207, 1224 (N.D.Ga.1981), that "[m]ost adult zoning ordinances passed in the wake of *Young v. American Mini Theatres, Inc.*, have contained grandfather clauses permitting pre-existing, nonconforming uses as to all regulated adult businesses." The City simply did not " 'adequately justif[y] its substantial restriction of protected activity,' " *Avalon Cinema*, 667 F.2d at 662 (quoting *Schad*, 452 U.S. at 72, 101 S.Ct. at 2184), in a manner sufficient to justify its ex post facto treatment of Orange Avenue's contemplated use.

 In sum, we think that 754 Orange showed both a threat of irreparable harm and a likelihood of success on the merits in its challenge to the City's enforcement of its zoning ordinance against the operation of its bookstore.

2. *The Coin-Operated Machines Issue.* In light of the provision in section 32–2.7 that "no coin operated amusement machines ... shall be permitted in any retail store," the City conceded at oral argument that its zoning ordinance operates as an absolute bar to coin-operated amusement machines (assuming that the ordinance applies at all to coin-operated viewing machines in private or individual booths).[7]

---

**7.** This concession strikes us as yet another puzzling feature of the City's litigation strategy,

since it is not initially clear whether, under section 32–2.7, "retail store" refers to all stores

But even if that provision were to be eliminated by amendment, the City still would have serious problems with its licensing ordinance. This is true by virtue of the discretion given the police department (presumably the Chief of Police) under a licensing ordinance that sets forth no standards for the issuance or revocation of a license. *Shuttlesworth*, 394 U.S. at 150–51, 89 S.Ct. at 938–39; *Cantwell v. Connecticut*, 310 U.S. 296, 305–07, 60 S.Ct. 900, 904–05, 84 L.Ed. 1213 (1940). Moreover, so far as appears on the face of the ordinance, there is no provision for judicial review as required under *Freedman v. Maryland*, 380 U.S. 51, 58–59, 85 S.Ct. 734, 738–39, 13 L.Ed.2d 649 (1965); *see also Interstate Circuit, Inc. v. City of Dallas*, 390 U.S. 676, 685, 88 S.Ct. 1298, 1303, 20 L.Ed. 225 (1968) (vague censorship standards are not cured merely by de novo judicial review). And lest there be any doubt as to irreparability of harm were the present ordinances to be enforced to prevent the coin-operated film machines from being utilized, 754 Orange would, like the appellee in *414 Theatre Corp. v. Murphy*, 499 F.2d 1155, 1160 (2d Cir.1974), be required to choose between continuing without a license in its business, thereby subjecting itself and its employees to the threat of criminal and civil prosecution, or removing the machines from its premises permanently or temporarily.

### Conclusion

Thus we affirm the district court's grant of a preliminary injunction. Doing so, how-

ever, we are careful to point out that it is possible for the City—at least if it were, and possibly if it were not, to follow the lead of other cities in the wake of *American Mini Theatres*, and "grandfather in" existing uses—to draw an ordinance or ordinances that would limit the sale, showing, or purveyance of sexually explicit material or films, properly and specifically defined as such, at least in certain areas or certain distances reasonably related to the preservation of neighborhoods or the protection of children. It might also be possible to define what an adult bookstore is by the nature of its patrons and by limitations in respect thereto, on the one hand, and by reference to the nature of materials sold, on the other. The ordinances here in question, however, do not begin to meet the tests required by the Supreme Court or the lines drawn by this and other courts. The judgment therefore must be and is hereby affirmed.

---

engaged in the sale of goods *and* services to ultimate consumers, or whether the term is intended, as more commonly understood, to refer only to those stores engaged in the sale of goods or commodities. *See, e.g.,* Webster's Third New International Dictionary 1938 (1971) ("retail" defined as "the sale of commodities or goods in small quantities to ultimate consumers—opposed to *wholesale* "). The City's brief argues that the provision prohibiting retail stores from

operating coin-operated amusement machines did not operate as a total ban, since

> [a]lternatively, the plaintiff could operate its' [*sic* ] facility as an amusement hall rather than a retail bookstore. It is also conceivable that the plaintiff could rent another location within the forum (City of West Haven) in which to place only coin-operated booths, and it could continue to operate the bookstore as a separate entity.